FILED

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

AUG - 1 2008
Aug 1, 2008
JUDGE JAMES F. HOLDERMAN
UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA and the STATES of FLORIDA and ILLINOIS EX REL. [UNDER SEAL], | ) ) ) ) | CIVIL ACTION NO. 07-C-5777 |
| PLAINTIFFS, | ) ) ) | CHIEF JUDGE JAMES F. HOLDERMAN |
| v. | ) ) | |
| [UNDER SEAL], | ) ) | FILED UNDER SEAL PURSUANT TO |
| DEFENDANTS. | ) ) | 31 U.S.C. § 3730(b)(2) |

## THIRD AMENDED COMPLAINT

It is necessary to restrict access to the case because it is filed pursuant to 31 U.S.C. 3730.

Dated: August 1, 2008

By: _____
Keith E. (Chuck) Roberts, Jr. #6186216
ROBERTS AND ASSOCIATES PC
104 East Roosevelt Road, Suite 202
Wheaton, Illinois 60187
chuckroberts@roberts-law.com
Telephone: (630) 668-4211

PHILLIPS & COHEN LLP
Mary Louise Cohen
mlc@phillipsandcohen.com
Peter W. Chatfield
peter@phillipsandcohen.com
Timothy P. McCormack
tmccormack@phillipsandcohen.com
2000 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 833-4567

COUNSEL FOR *QUI TAM* PLAINTIFFS

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and the STATES of FLORIDA and ILLINOIS ex rel. ADAM B. RESNICK and MAUREEN NEHLS, | ) ) ) ) | CIVIL ACTION NO. 07-C-5777 |
|  | ) | **CHIEF JUDGE JAMES F.** |
| PLAINTIFFS, | ) ) | **HOLDERMAN** |
| *v.* | ) ) ) |  |
| OMNICARE, INC., MORRIS ESFORMES, PHILLIP ESFORMES, LANCASTER LTD. d/b/a LANCASTER HEALTH GROUP, | ) ) ) | **FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
|  | ) | |
| DEFENDANTS. | ) ) | JURY TRIAL DEMANDED |

**THIRD AMENDED COMPLAINT**

Qui tam plaintiffs Adam B. Resnick and Maureen Nehls ("Relators")

allege as follows:

**I.     INTRODUCTION**

1.     This is an action to recover damages and civil penalties on behalf of the

United States of America and the States of Florida and Illinois arising from false

statements and claims made or caused to be made by the Defendants to: (1) the United

States and its agents and intermediaries in violation of the Federal False Claims Act, 31

U.S.C. §§ 3729 et seq. (the "Federal FCA"); (2) to the States of Florida and Illinois and

their agents and intermediaries (hereafter collectively the "States") in violation of the

Florida False Claims Act, sections 68.081 et seq., Florida Statutes, the Illinois

Whistleblower Reward and Protection Act, 740 Ill. Comp. State. §175/1 et seq.; and (3)

to Illinois insurance companies and insured persons and their agents and intermediaries in violation of the Illinois Insurance Claims Frauds Prevention Act, 740 Ill. Com. Stat. §92. The false claims and statements at issue were made or caused to be made by the Defendants in connection with kickbacks and claims for payments made for pharmaceutical products.

2.      Originally enacted in 1863, the Federal FCA was substantially amended in 1986 by the False Claims Amendments Act. The 1986 amendments enhanced the government's ability to recover losses sustained as a result of fraud against the United States.

3.      The Federal FCA provides that any person who knowingly submits or causes to be submitted to the United States or recipients of Federal funds a false or fraudulent claim for payment or approval is liable for a civil penalty of between $5,500 and $11,000 for each such claim, and three times the amount of the damages sustained by the United States. The Act empowers persons having information regarding a false or fraudulent claim against the United States to bring an action on behalf of the United States and to share in any recovery. The original complaint must be filed under seal, without service on the defendants. That complaint remains under seal while the United States investigates the allegations and determines whether to join the action.

4.      The Florida and Illinois False Claims Acts also impose liability on anyone who, *inter alia*: (a) knowingly presents or causes to be presented to the State a false claim for payment or approval; (b) knowingly makes, uses, or causes to be made or used a false record or statement to get a false or fraudulent claim paid or approved by the State; or (c)

— 3 —

conspires to submit a false claim to the State or to deceive the State for the purpose of getting a false or fraudulent claim allowed or paid.

5.      Anyone who violates the Florida or Illinois False Claims Act is liable for a civil penalty of between $5,000 and $10,000 for each such claim, and three times the amount of the damages sustained by the State.  As with the Federal FCA, the State Acts empower persons having information regarding a false or fraudulent claim against the States to bring an action on behalf of the States and to share in any recovery.

6.      The Illinois Insurance Claims Fraud Prevention Act, 740 Ill. Comp. Stat. §92, provides for a civil action against any person who commits the crime of insurance fraud or who knowingly offers or pays "any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against any insured person or the person's insurer." 740 Ill. Comp. State. §92/5(a).

7.      Pursuant to Comp. Stat. §5/46-1 of the Illinois Criminal Code, a person commits the offense of insurance fraud when he or she: "knowingly obtains, attempts to obtains, or causes to be obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company."

8.      Section 15(a) of the Illinois Insurance Fraud Act provides for a qui tam civil action  in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.   Subsection 15(a) provides: "An interested person may bring a civil action for a violation of this Act for the person and the

State of Illinois. The action shall be brought in the name of the State." 740 Ill. Comp. Stat. §92/15(a).

9.      Pursuant to the Federal and State False Claims Acts and the Illinois Insurance Claims Fraud Prevention Act, Relators seek to recover on behalf of the United States and the States damages and civil penalties arising from false and improper charges contained in claims for payment that Defendants submitted or caused to be submitted to the Medicare program, the Medicaid program, other Federal or State-funded health care programs, and Illinois insurance companies and/or insured persons.

10.      Defendant Omnicare, Inc. ("Omnicare") is a large institutional pharmacy that has grown dramatically over the last several years by purchasing other smaller institutional pharmacies. One such purchase occurred in June 2004, when Omnicare, in conspiracy with Phillip and Morris Esformes, violated Federal and Florida anti-kickback laws in connection with Omnicare's purchase of Total Pharmacy Services, LLC. As alleged below, the price paid to Total Pharmacy Services, LLC grossly exceeded its fair market value. The inflated purchase price was in fact paid to Defendants Morris and Phillip Esformes, and others, to buy long term pharmacy contracts with a number of nursing homes in violation of Federal and Florida anti-kickback laws.

11.      Similarly, on or about February 2008, Omnicare bought a Chicago-based pharmacy, ProCare. ProCare was created and sold to Omnicare by Lancaster, Ltd. d/b/a the Lancaster Health Group, which also owns a chain of nursing homes in the Chicago area. Omnicare paid Lancaster an inflated price for ProCare in exchange for the promise of future referrals from the Lancaster-owned nursing homes, in violation of the Federal

anti-kickback law.

12.     In each of these cases, the nursing home contracts obtained as a result of Omnicare's improper payments allowed Omnicare to submit thousands of claims for reimbursement to health care programs funded by the United States, the States and/or an Illinois insurance companies and/or insured persons.  As a result, the United States, the States and Illinois insurance companies and/or insured persons paid Defendants and their co-conspirators substantial amounts that would not have paid had the truth been known about Defendants' and their co-conspirators' misconduct.

## II.     JURISDICTION AND VENUE

13.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. §1367, and 31 U.S.C. § 3732, the last of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730.

14.     Further, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in this Complaint.

15.     Under 31 U.S.C. §3730(e) and the comparable provisions of the State False Claims Acts, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint.  Each Relator, moreover, would qualify under those sections as an "original source" of the allegations in this Complaint even had such a public disclosure occurred.

16.     The Court has personal jurisdiction over the Defendants pursuant to 31 U.S.C.  §3732(a), which authorizes nationwide service of process, and because

Defendants Lancaster Health Group and Omnicare can be found in and transact business that is the subject matter of this lawsuit in the Northern District of Illinois. Many of the nursing homes that were the subject of the kickback-induced contracts are in Illinois.

17.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants Lancaster and Omnicare can be found and transacts business that is the subject matter of this lawsuit in the Northern District of Illinois.

## III.    PARTIES

18.     Relators Adam Resnick and Maureen Nehls bring this action against Defendants Omnicare, Morris Esformes and Phillip Esformes, for the allegations set forth in paragraphs 1 through 75, 81 through 98, and 107 through 115 below, on their own behalf and on behalf of the United States and the State of Florida.

19.     Relator Maureen Nehls brings this action against Defendants Omnicare and Lancaster, Ltd., for the allegations set forth in paragraphs 1 through 41, 76 through 90, 99 through 106, and 116 through 134 below, on her own behalf and on behalf of the United States and the State of Illinois.

20.     Relators are residents of Illinois.

21.     Defendant Omnicare, Inc., headquartered in Covington, Kentucky, is a provider of pharmaceutical care for the elderly. Omnicare serves approximately 1.4 million residents in long-term care facilities and other chronic care settings across the United States (including Illinois and Florida) and in Canada. It is the largest U.S. provider of pharmacy services to nursing home residents. As a result of the fraudulent transactions alleged herein and similar transactions into which it likely also has entered

– 7 –

(based upon its pattern of behavior of which Relators are personally aware), Omnicare

has gained market share that has allowed it to increase volume discounts that it receives

from pharmaceutical manufacturers and wholesale distributors and thus reap additional

profits for its sales of pharmaceutical services to nursing homes throughout the country.

22.     Defendant Morris Esformes resides in Illinois and Florida. Morris

Esformes owns and manages nursing homes in Florida and Illinois.

23.     Defendant Phillip Esformes is the son of Morris Esformes. Phillip

Esformes is a resident of Florida. Phillip Esformes owns minority portions of nursing

homes, and is actively involved in the operations and financial management of nursing

homes owned or controlled by his father.

24.     Defendant Lancaster, Ltd. is an Illinois corporation, with headquarters in

Chicago, Illinois. Lancaster, Ltd., which does business as Lancaster Health Group, owns,

either directly or through affiliated and/or subsidiary companies, seven nursing homes in

the Chicago area. Lancaster is run by two brothers, Lawrence and Ronald Zung, both of

Chicago. It is owned by the Zungs and other members of their extended family.

Lancaster, Ltd., Lancaster Health Group and any affiliates and/or subsidiaries of

Lancaster, Ltd. will be referred to collectively as "Lancaster" in this Complaint.

## IV.     **BACKGROUND**

25.     Medicare is a Federally-funded health insurance program primarily

benefitting the elderly. Medicare Part A, the Basic Plan of Hospital Insurance, covers the

cost of inpatient hospital services and post-hospital nursing facility care.

26.     Medicaid is a program funded jointly by the Federal and state

governments to provide health care benefits for certain people, primarily the poor and disabled.

27.     Nursing facilities typically contract with an institutional pharmacy to provide the drugs and other pharmaceutical products needed by their patients – whether payment is to be made by Medicare, Medicaid, another State-funded health care program, private insurance or the patient.

28.     Since 1998, Medicare has paid skilled nursing facilities ("SNF's") under a prospective payment system ("PPS"). Under PPS, Medicare pays a fixed fee per patient per day based upon the acuity of each patient's condition. That fixed fee covers the pharmaceutical products provided to the patients. Thus, the SNF bears the risk of excessive drug costs.

29.     In contrast, prescription drugs for Medicaid patients (who make up a majority of the patients at most nursing homes) are typically billed to the Medicaid program by the pharmacy. The reimbursement levels are set for each drug by the relevant state Medicaid program.

30.     The Federal health care Anti-Kickback statute, 42 U.S.C. §1320a-7b(b), arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically unnecessary, of poor quality, or even harmful to a vulnerable patient population. To protect the integrity of Federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of

– 9 –

care.

31.     The Federal Anti-Kickback statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending or arranging for the purchase of any item for which payment may be made under a Federally-funded health care program. 42 U.S.C. §1320a-7b(b). Under this statute, health care companies may not offer or pay – and sources of patient referrals may not solicit or receive – any remuneration that is intended to induce the purchase, order or recommendation of any good, facility, service or item that may be paid for, in whole or part, by a Federal health care program. The law thus prohibits any kind of payment by a pharmacy company to a nursing home or its principals or agents, in cash or kind, that has as one of its purposes inducement of the nursing home to purchase prescriptions of the company's pharmaceutical products.

32.     The statute defines impermissible "payments" broadly as: "any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind." 42 U.S.C. § 1320a-7b(b)(1). In addition to the more obvious types of remuneration (e.g., cash payments, gifts of cars, free vacations, etc.), the statute also prohibits less direct forms of payment such as inappropriately high-paying "employment" contracts, subsidized office space or equipment, the provision of free or discounted medical services or supplies (such as nursing services), or investment arrangements where the referring provider has a substantial financial interest in seeing that the joint venture receives referrals from the investor.

33.     Pursuant to its authority under that Act, the Department of Health and

Human Services ("HHS") has delineated exceptions to application of the Federal Anti-Kickback statute for, among other things, certain kinds of investment interests that HHS has concluded do not significantly implicate the policy concerns underlying the Act. See 42 C.F.R. § 1001.952. Those exceptions, however, are narrowly tailored so as not to permit improper economic inducements to be disguised as unproblematic investment mechanisms. An entity whose activity otherwise would be covered by the broad, remedial language of the proscriptions under the Act is exempted from liability for such conduct only if that entity's investment interests and conduct meet all of the applicable standards set forth in the regulations for one of the three categories of investment exceptions that HHS has approved. Id. § 1001.952(a). Thus, in the category most relevant to this matter, an entity that possesses investment interests held by active or passive investors who stand to gain from health care sales of the entity can find safe harbor from the proscriptions of the Federal Anti-Kickback statute only to the extent that it meets all eight applicable standards set forth in 42 C.F.R. § 1001.952(a)(2). Most notably, these include the requirement that no more than 40% of the value of each class of the investment interests may be held in the year prior to the transaction at issue "by investors who are in a position to make or influence referrals to . . . or otherwise generate business for the entity," and that no more than 40% of the entity's gross revenue relating to furnishing of health care items or services in the prior year my come "from referrals or business otherwise generated from investors." Id. §§1001.952(a)(2)(i) & (vi).

34.    HHS has specifically expressed concern about the purchase of a physician practice or other providers in a position to make referrals by an entity that receives

referrals from that practice.  In a December 22, 1992 Opinion Letter, the HHS Office of

the Inspector General ("OIG") cautioned that the purchase of a physician practice by a

hospital

> "as a means to retain existing referrals or to attract new referrals . . .
>
> implicate[s] the anti-kickback statute because the remuneration paid for
>
> the practice can constitute illegal remuneration to induce the referral of
>
> business reimbursed by the Medicare or Medicaid programs."

35.     The letter further advised that, in order to determine whether the price paid

for a physician practice constituted an illegal kickback:

> "it is necessary to scrutinize the payments (including the surrounding facts
>
> and circumstances) to determine the purpose for which they have been
>
> made.  As part of this undertaking, it is necessary to consider the amounts
>
> paid for the practice . . . to determine whether they reasonably reflect the
>
> fair market value of the practice . . . , in order to determine whether such
>
> items in reality constitute remuneration for referrals."

(emphasis in original).

36.     Moreover, the letter cautioned:

> "When considering the question of fair market value, we would note that
>
> the traditional or common methods of economic valuation do not comport
>
> with the prescriptions of the anti-kickback statute.  Items ordinarily
>
> considered in determining the fair market value may be expressly barred
>
> by the anti-kickback statute's prohibition against payment for referrals. . . .

Accordingly, when attempting to assess the fair market value . . .

attributable to a physician's practice, it may be necessary to exclude from

consideration any amounts which reflect, facilitate or otherwise relate to

the continuing treatment of the former practice's patients. . . . <u>Thus, any</u>

<u>amount paid in excess of the fair market value of the hard assets of the</u>

<u>physician practice would be open to question</u>. . . . Specific items that we

believe would raise a question as to whether payment was being made for

the value of the referral stream would include, among other things: . . .

payment for goodwill; . . . payment for covenants not to compete;"

(emphasis added).

37.     The HHS OIG recently applied these same principles in its prosecution of

a large institutional pharmacy – Pharmerica – for kickbacks paid in connection with its

purchase of a small pharmacy affiliated with a chain of nursing homes.  The OIG alleged

that Pharmerica had violated the federal anti-kickback statutes when it paid an excessive

price for a small Virginia pharmacy (Hollins Manor I, Inc.) in return for a commitment

from the seller to refer the Medicaid and Medicare pharmacy business from a chain of

nursing homes also owned by the seller for the next 7 years.  Specifically, in its June 17,

2004 demand letter, the OIG charged that "Pharmerica paid that substantial purchase

price [$7.2 million] to induce the sellers to refer their nursing facilities residents'

Medicaid business to PharMerica," and that "[t]o a significant extent, the purchase price

reflected the value of the future business generated by these referrals."   Ultimately,

Pharmerica settled the administrative action on March 29, 2005, agreeing to pay a record-

setting $5.975 million fine and enter into a comprehensive 5-year corporate integrity agreement.

38.     Violation of the Federal Anti-Kickback statute subjects the violator to exclusion from participation in Federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation. 42 U.S.C. §§1320a-7(b)(7), 1320a-7a(a)(7). These civil monetary penalties may be up to $50,000 for each act in violation of the Anti-Kickback statute and damages of up to three times the amount of the remuneration offered or paid. 42 U.S.C. §1320a-7(b).

39.     Compliance with the Anti-Kickback law is a precondition to participation as a health care provider under the Medicaid, CHAMPUS/TRICARE, CHAMPVA, Federal Employee Health Benefit Program, and other Federal health care programs.

40.     Florida and Illinois law similarly prohibit the offer, payment, solicitation or receipt of remuneration or kickbacks in exchange for referrals. Compliance with the Federal and State Anti-Kickback laws is a precondition to participation as a health care provider under the Medicaid program and other State-funded health care programs.

41.     Thus, compliance with the Federal and State Anti-Kickback statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from the Medicare program, the Medicaid program, other Federal and State-funded health care programs and Illinois insurance companies and/or insured persons.

## V.     **ALLEGATIONS**

## A.     **The Total Ancillary Services Transaction**

42.     In mid-2002, Tim Dacy, Bruce Paler, and Phillip Esformes organized a

– 14 –

limited liability company named Total Ancillary Services, LLC ("TAS"). Dacy owned
51%, Defendant Phillip Esformes owned 40%, and Bruce Paler owned 9%. At that time,
Dacy, Phillip Esformes and Paler also created Total Pharmacy (later known as Total
Pharmacy, Illinois) as a wholly-owned subsidiary of TAS to provide pharmaceutical
products to nursing homes. Later, TAS created Total Pharmacy of Florida and Total
Pharmacy of Illinois (collectively "Total Pharmacy").

43.     Phillip Esformes's stake in TAS was offered as a way to generate business
with nursing homes owned by Phillip's father Morris Esformes. Phillip Esformes also
had a minority ownership share in some of those homes.

44.     Relator Nehls was hired by Paler in 2002 to serve as the Vice President of
Pharmacy Operations. When recruited for the job, Nehls was told by Paler that Morris
Esformes wanted his own pharmacy for his nursing homes so that he could control costs.
Nehls, who was reluctant to leave her then-current employer, was assured that Total
Pharmacy was a long term venture.

45.     Tim Dacy told Relator Resnick that Phillip Esformes was paid $100,000 a
month by TAS. Nehls was aware that substantial payments were made each month from
TAS to Phillip Esformes. In return, all of the Esformes homes in Illinois began
purchasing drugs from Total Pharmacy for their patients, many of whom were Medicare
and/or Medicaid beneficiaries. These Esformes-owned facilities were: Bourbonnais
Terrace; Kankakee Terrace; Joilet Terrace; Lake Park Center; Terrace Nursing Home,
LLC; West Chicago Terrace; Woodside Extended Care; Brunham Healthcare Properties
LLC; Community Care Center; Crestwood Terrace; Emerald Park; Frankfort Terrace; and

Presidential Pavilion LLC.

46.     Morris Esformes insisted that each contract be signed by the manager of the nursing facility because he did not want his name appearing on contracts with Total Pharmacy.

47.     In addition, Morris Esformes obtained one-year contracts for Total Pharmacy with several nursing homes in Illinois where he had some substantial financial relationships. These homes included Victorian Manor; Hillside Healthcare; and Terrace North.

48.     Morris Esformes also had sufficient influence over several other nursing homes in Illinois, and used that influence to force those homes to switch from their then-current pharmacy and, instead, give one-year contracts to Total Pharmacy. These homes were Doctors Nursing & Rehabilitation Center, LLC; Kankakee Nursing & Rehabilitation Center; Douglas Rehabilitation & Care Center; and Palos Hills Extended Care LLC.

49.     During this period, Total Pharmacy did not do any marketing, nor did it seek out customers. Instead, 100% of its business came through Morris Esformes.

50.     It was apparent to Relator Nehls that the professional staff at the homes identified in the preceding paragraphs were unhappy with being forced to switch pharmacy providers.

51.     In 2003, Total Pharmacy opened operations in Florida where Morris Esformes also owned a number of homes. Again, all of the business Total Pharmacy did in that state was with homes owned or controlled by Morris Esformes. Total Pharmacy

— 16 —

had one-year contracts with the Morris Esformes' homes. (One-year contracts are the norm in the industry.) Again, Morris Esformes insisted that these contracts be between Total Pharmacy and the individual homes and that they be signed by an official at each home.

52.     The Total Pharmacy customers in Florida included Bradford Terrace; Fairhaven; Harmony Center at Greenbriar; Nursing Center at Mercy; Oceanside; Woodland-Alachua; Woodland-Citrus; Woodland-Deland; and Southpoint Terrace.

53.     Morris Esformes was in continual contact with Paler and provided Paler with substantial direction concerning the pharmacy's operations. Paler (and occasionally Phillip Esformes) relayed these directions (which included such matters as formulary decisions and financial arrangements) to Nehls as she ran the pharmacy. Morris Esformes constantly demanded substantial payments from TAS. Sometimes these payments came in the form of charitable contributions made at his directions. Other times, he demanded that Total Pharmacy write off amounts owed by his nursing homes. He also required that Total Pharmacy make payments to Dr. Luis Veras of $3,300 a month.

54.     Nehls was constantly struggling to keep a range of drugs on the formulary for Medicare patients. Because the nursing homes were at risk for the cost of drugs provided to Medicare recipients, Morris and Phillip Esformes refused to put some expensive drugs on the pharmacy's formulary. On the other hand, these restrictions did not apply to the patients with Medicaid coverage because these were a source of profit to the pharmacy and did not impose additional expense on the nursing homes. As a result, a

– 17 –

patient could receive one set of drugs while on the Medicare skilled nursing ward and then be switched to a different and more costly drug regimen when he or she was moved to the unskilled Medicaid ward.

55.     In late 2003, Tim Dacy asked Relator Resnick to serve as a consultant to Total Pharmacy.  Resnick's assignment was to pitch limited partnership shares in Total Pharmacy "franchises" in California and Florida under the name "US Pharmacy."  As a result, Resnick has first-hand knowledge of the operations of TAS, Total Pharmacy, and the circumstances surrounding the sale of Total Pharmacy to Omnicare in 2004.

56.     Largely as a result of the burdens Morris Esformes placed on it, Total Pharmacy was not profitable.

57.     The original capital contributions to TAS totaled $30,000 ($10,000 from each Dacy, Phillip Esformes and Paler), and the operations – including Total Pharmacy – were financed with a line of credit from Central Illinois Bank, which is the bank used by Morris Esformes.

58.     From the beginning, the owners of Total Pharmacy used the bank loans to make substantial payments to themselves, but as time went on, payments to Dacy and Paler stopped. Phillip Esformes, however, continued to draw his monthly payment..

59.     By early 2004, Total Pharmacy owed the bank more than $7 million, and the bank told the pharmacy that it needed to pay down at least $1 million on its loan. Morris Esformes intervened, and convinced the bank to give Total Pharmacy a 90-day extension on the repayment demand, and Morris Esformes began to try to find a buyer.

60.     Institutional pharmacies are valued according to the number of beds they

serve, the average revenue they generate per bed, and the length of their contracts to supply those beds. The profit an institutional pharmacy can make depends on the difference between the price it pays to purchase drugs and the reimbursement it obtains for those drugs. Because larger volumes of business bring greater discounts, the key to building the most profitable institutional pharmacy is to generate the highest possible volume of business in order to lock in the greatest discount from pharmaceutical suppliers.

61.     In early 2004, Omnicare reviewed Total Pharmacy's business (which included one-year contracts with its client nursing homes). Omnicare offered to purchase Total Pharmacy of Illinois for $14 million, but insisted that Total Pharmacy's $7 million in accounts receivable would be retained by Omnicare, thus making the net value of the offer $7 million.

62.     Morris Esformes thought this number was too low, and he instructed Dacy to see what price Neighborcare, a competitor of Omnicare would be willing to pay. Dacy delegated this task to Resnick.

63.     On March 9, 2004, Jack Kordash, Executive Vice President of NeighborCare sent a confidentiality agreement to Resnick. Subsequently, Mark Renfree, CFO of Total Pharmacy provided information about Total Pharmacy's operations to Kordash.

64.     On March 22, Kordash asked Resnick for more details on the information provided by Renfree. Kordash also said that Renfree had told him that "you are currently negotiating contracts that can be extended for 5-10 years."

65.     Resnick passed on these questions to Renfree who, on March 22, told Kordash that "[a]s of January 31, 2004, we have 3, 289 licensed beds under contract. Of these, 2,711 are under 10-year contracts which can only be cancelled for cause following a cure period and 578 are under 1-year contracts which can be cancelled with 30 days notice."

66.     This statement was false. There were no 10-year contracts in place at that time.

67.     Jack Kordash confirmed that "10-year contracts are worth a premium," and he put his estimated value of Total Pharmacy of Illinois between $10 and $13 million.

68.     In April 2004, Morris Esformes and Joel Germunder, CEO of Omnicare, met at Morris Esformes' headquarters to discuss the sale of both Total Pharmacy of Illinois and Total Pharmacy of Florida . Tim Dacy also attended the meeting, along with Tracy Finn of Omnicare. When staff at Total Pharmacy heard that a sale might be coming and expressed dismay, Dacy told the staff that Morris Esformes was directing the sale and that the matter was out of his hands.

69.     Dacy described the meeting between Germunder and Morris Esformes to Resnick immediately after it occurred. Dacy told Resnick that Omnicare offered to pay $15 million for Total Pharmacy if there were 3-year contracts in place with the Illinois and Florida homes owned by Esformes, $20 million for 5-year contracts with the Esformes-owned homes, and $25 million if there were 10-year contracts with the Esformes-owned homes. Omnicare understood in making these representations that no

such contracts currently existed and that any extensions of existing contracts that would be made would be done for the specific purpose of obtaining a higher price for sale of Total Pharmacy to Omnicare.

70.     While these negotiations were pending, Total Pharmacy secured 5-year contracts with an automatic 5-year renewal provision with the homes owned by Morris Esformes. However, rather than having each contract signed individually by the administrator of each nursing home, in June 2004 Morris Esformes signed one contract, as President of EMI Enterprises, Inc., which covered all of the Florida homes owned by Morris Esformes (and one that was scheduled to open in January 2005). This contract was back-dated to March 1, 2004. The homes covered by this contract included: Bradford Terrace; Fair Havens Center; Fleming Island Facility (opening in January 2005); Harmony Healthcare Center; The Nursing Center at Mercy; Oceanside Extended Care; Southpoint Terrace; The Terrace of Daytona Beach; Woodland Terrace; Woodland Terrace of Citrus County; and Woodlands Care Center of Alachua County.

71.     Similar group contracts were signed by Morris Esformes for his Illinois homes.

72.     Esformes still wanted a bigger price, and he offered to secure contracts for Omnicare with a number of homes in Missouri owned by Dr. Sharo Shirshekan if Omnicare would increase the price. At this time, Total Pharmacy was not authorized to do business in Missouri.

73.     Morris Esformes contended that Dr. Shirshekan owed him $6 million, although Dr. Shirshekan contested the legitimacy of the debt. Esformes offered to

forgive the debt if Shirshekan would give him multi-year contracts with Shirshekan's nursing homes.

74.     Shirshekan reluctantly agreed to give 5-year contracts to Omnicare, and the purchase price to Total Pharmacy was increased so that – in addition to the $25 million purchase price – Total Pharmacy retained the right to keep the $7 million it held in accounts receivable.  The final Omnicare offer, once the contracts with the Shirshekan homes were delivered, was thus a net $32 million.

75.     The sale was closed on June 30, 2004.  According to the paperwork accompanying the sale, Phillip Esformes received $10 million for his share of Total Pharmacy.  However, Resnick was present during a call conducted over a speaker phone between Phillip Esformes and Tim Dacy, in which Phillip complained that his father was insisting that Phillip pay the entire $10 million to him.  Phillip Esformes asked Dacy to lie and tell Morris Esformes that the tax rate on the $10 million was 40% (rather than the actual 15% rate) so that Phillip could retain some of the $10 million.

**B.     The ProCare Transaction**

76.     Lancaster owns seven nursing homes in the Chicago area, including: Fairmont Care Centre in Chicago, Dolton Healthcare Centre in Dolton, Lake Shore Healthcare & Rehab Center in Chicago, Elm Brook Healthcare & Rehab Centre in Elmhurst, Norridge Healthcare & Rehab Centre in Norridge, Oakbrook Healthcare Centre in Oakbrook, and Wauconda Healthcare And Rehab in Wauconda.

77.     On or about October 17, 2005, Lancaster created ProCare Pharmaceutical, LLC ("ProCare") to provide pharmaceutical services to its nursing homes.  Lancaster

shared ownership of ProCare with Chuck Benain, the pharmacist who ran the pharmacy operations.

78.     Before February 2008, Lancaster bought Mr. Benain's share of ProCare.

79.     On or about February 2008, Lancaster sold ProCare to Omnicare. Omnicare paid an inflated price because of the value of the contracts between ProCare and the Lancaster-owned homes, and the value of the future referrals from the Lancaster homes.

80.     That the price included a kickback – in the form of a substantial mark-up of the sales price – in exchange for the promise of future referrals from the Lancaster-owned homes is demonstrated, inter alia, by the fact that the price Omnicare paid Lancaster for Mr. Benain's former share of the pharmacy is significantly higher than the amount Lancaster had paid for it shortly before.

## VI.   **SUMMARY**

81.     As described above, Omnicare has engaged in a pattern and practice of buying contracts to supply medications to nursing facilities.

82.     The inducements offered by Omnicare in the form of a high package sales price for a pharmacy and long-term contracts with captive nursing home customers violate Federal and State law.

83.     Claims submitted by Omnicare to the United States, the States, and Illinois insurance companies and/or insured persons for medications supplied to patients who reside in homes where Omnicare obtained contracts through the payment of such unlawful inducements are fraudulent claims and are not properly subject to reimbursement under the Medicare program, the Medicaid program, other Federal or

State-funded health care programs, or by Illinois insurance companies and/or insured persons.

84.     As also described above, Morris and Phillip Esformes have engaged in a pattern and practice of using their control over nursing home facilities to cause those facilities to refer patients to pharmacies owned or controlled by them.

85.     Morris and Phillip Esformes have also sold to Omnicare long-term contracts to supply medications to the nursing facilities controlled by them.  These practices by Morris and Phillip Esformes violate Federal and State Anti-Kickback laws and the Federal and State False Claims Acts.

86.     Claims submitted by Total Pharmacy to the United States or Florida for medications supplied to patients who reside in homes owned or controlled by Morris or Phillip Esformes are fraudulent claims and are not properly subject to reimbursement under the Medicare program, the Medicaid program, other Federal or State-funded health care programs, or by Illinois insurance companies and/or insured persons.

87.     Prescription forms or any other documents generated by the Esformes-controlled nursing homes pursuant to contracts with Omnicare and used or relied upon by Omnicare to support claims submitted to the United States or Florida are false statements and records used to get the United States and Florida to pay or approve false or fraudulent claims.

88.     Lancaster also sold to Omnicare long-term contracts to supply medications to the nursing facilities controlled by them.  These practices by violate Federal and Illinois law.

89.     Claims submitted by Omnicare and/or ProCare to the United States,

– 24 –

Illinois or Illinois insurance companies and/or insured persons for medications supplied to patients who reside in homes owned or controlled by Lancaster are fraudulent claims and are not properly subject to reimbursement under the Medicare program, the Medicaid program, other Federal or State-funded health care programs, or by Illinois insurance companies and/or insured persons.

90.     Prescription forms or any other documents generated by the Lancaster-controlled nursing homes pursuant to contracts with Omnicare and used or relied upon by Omnicare to support claims submitted to the United States, Illinois, Illinois insurance companies and/or insured persons are false statements and records used to get the United States, Illinois, Illinois insurance companies and/or insured persons to pay or approve false or fraudulent claims.

**COUNT ONE**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)-(3)**

91.     Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 75, 81 through 98, and 107 through 115 of this Complaint.

92.     This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

93.     Through the acts described above, Defendants Omnicare, Morris Esformes and Phillip Esformes knowingly presented and caused to be presented to the United States fraudulent claims, records, and statements in order to obtain reimbursement for pharmacy services provided under the Medicare program, the Medicaid program or other Federally-funded health care programs.

94.     Through the acts described above, Defendants Omnicare, Morris Esformes

and Phillip Esformes knowingly made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid or approved by the United States.

95.     In the manner described above, Defendants Omnicare, Morris Esformes and Phillip Esformes have conspired among themselves with the other persons and entities identified in this Complaint whereby they have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent pharmacy service contracts for care provided nursing home residents insured by the Medicare program, the Medicaid program or other Federally-funded health care programs.

96.     Defendants Omnicare, Morris Esformes and Phillip Esformes and their co-conspirators knew, both in fact and within the meaning of the Federal False Claims Act, that through these inflated long-term pharmacy arrangements that they and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the False Claims Act, by getting false or fraudulent claims submitted by them and/or their co-conspirators to the Medicare program, the Medicaid program or other Federally-funded health care programs allowed or paid.

97.     The United States, unaware of the falsity of the claims made by Defendants Omnicare, Morris Esformes and Phillip Esformes, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

98.     By reason of these payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

**COUNT TWO**
**FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)-(3)**

99.     Relator Nehls realleges and incorporates by reference the allegations made in Paragraphs 1 through 41, 76 through 90, 99 through 106, and 116 through 134 of this Complaint.

100.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.*, as amended.

101.    Through the acts described above, Defendants Omnicare and Lancaster knowingly presented and caused to be presented to the United States fraudulent claims, records, and statements in order to obtain reimbursement for pharmacy services provided under the Medicare program, the Medicaid program or other Federally-funded health care programs.

102.    Through the acts described above, Defendants Omnicare and Lancaster knowingly made, used, and caused to be made and used false records and statements to get false or fraudulent claims paid or approved by the United States.

103.    In the manner described above, Defendants Omnicare and Lancaster have conspired among themselves with the other persons and entities identified in this Complaint whereby they have agreed unlawfully to pay and receive unlawful kickbacks and to procure, sign, and accept the benefit of fraudulent  pharmacy service contracts for care provided nursing home residents insured by the Medicare program, the Medicaid program or other Federally-funded health care programs.

104.    Defendants Omnicare and Lancaster and their co-conspirators knew, both in fact and within the meaning of the Federal False Claims Act, that through these

inflated long-term pharmacy arrangements that they and their co-conspirators would be violating the Federal health care Anti-Kickback statute and the False Claims Act, by getting false or fraudulent claims submitted by them and/or their co-conspirators to the Medicare program, the Medicaid program or other Federally-funded health care programs allowed or paid.

105.     The United States, unaware of the falsity of the claims made by Defendants Omnicare and Lancaster, approved, paid, and participated in payments made by the United States' fiscal intermediaries for claims that otherwise would not have been allowed.

106.     By reason of these payments and approvals, the United States has been damaged, and continues to be damaged, in an amount yet to be determined.

### COUNT THREE
### FLORIDA FALSE CLAIMS ACT
#### Section 68.082(2)(a)-(c), Florida Statutes

107.     Relators reallege and incorporate by reference the allegations made in Paragraphs 1 through 75, 81 through 98, and 107 through 115 of this Complaint.

108.     This is a claim for treble damages and penalties under the Florida False Claims Act, sections 68.081 *et seq.*, Florida Statutes.

109.     Through the acts described above, Defendants Omnicare, Morris Esformes and Phillip Esformes and their agents and employees knowingly presented and caused to be presented to the State of Florida false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

110.     Through the acts described above, Defendants Omnicare, Morris Esformes

and Phillip Esformes and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Florida to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

111. Through the acts described above, Defendants Omnicare, Morris Esformes and Phillip Esformes, their agents, employees and other co-conspirators identified in this Complaint knowingly conspired to submit false claims to the State of Florida and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

112. Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

113. The State of Florida, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants Omnicare, Morris Esformes and Phillip Esformes, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

114. Defendants Omnicare, Morris Esformes and Phillip Esformes and their co-conspirators knew, both in fact and within the meaning of the Florida False Claims Act, that through the acts described above they would be violating the Federal and State Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims

submitted by them and/or their co-conspirators allowed or paid.

115.     By reason of these payments and approvals, the State of Florida has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT FOUR
### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(3)

116.     Relator Nehls realleges and incorporates by reference the allegations made in Paragraphs 1 through 41, 76 through 90, 99 through 106, and 116 through 134 of this Complaint.

117.     This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act, 740 Ill. Comp. Stat. §175/1 et seq.

118.     Through the acts described above, Defendants Omnicare and Lancaster and their agents and employees knowingly presented and caused to be presented to the State of Illinois false claims in order to obtain reimbursement for pharmacy services provided under the Medicaid program and other State-funded health care programs.

119.     Through the acts described above, Defendants Omnicare and Lancaster and their agents and employees knowingly made, used and caused to be made and used false records or statements to get the State of Illinois to pay or approve false or fraudulent claims for pharmacy services provided under the Medicaid program and other State-funded health care programs.

120.     Through the acts described above, Defendants Omnicare and Lancaster, their agents, employees and other co-conspirators identified in this Complaint knowingly conspired to submit false claims to the State of Illinois and to deceive the State for the purpose of getting the State to pay or allow false or fraudulent claims for pharmacy

services provided under the Medicaid program and other State-funded health care programs.

121.    Each prescription that was dispensed as a result of Defendants' illegal inducements represents a false or fraudulent record, and each claim for reimbursement for such prescriptions submitted to a State-funded health care program represents a false or fraudulent claim for payment.

122.    The State of Illinois, unaware of the falsity or fraudulence of the records, statements and claims made or submitted by Defendants Omnicare and Lancaster, their agents, employees and co-conspirators, approved, paid and continues to approve and pay claims that otherwise would not have been approved or paid.

123.    Defendants Omnicare and Lancaster and their co-conspirators knew, both in fact and within the meaning of the Illinois False Claims Act, that through the acts described above they would be violating the Federal and State Anti-Kickback statutes and the State False Claims Act, by getting false or fraudulent claims submitted by Defendants and/or their co-conspirators allowed or paid.

124.    By reason of these payments and approvals, the State of Illinois has been damaged, and continues to be damaged, in an amount yet to be determined.

## COUNT FIVE
### Illinois Insurance Claims Frauds Prevention Act
### 740 Ill. Comp. Stat. §92

125.    Relator Nehls realleges and incorporates by reference the allegations made in paragraphs 1 through 41, 76 through 90, 99 through 106, and 116 through 134 above as though fully set forth herein.

126.     This is a claim for treble damages and penalties under the Illinois Insurance Claims Frauds Prevention Act, Ill. Comp. Stat. §92/1 et seq. ("Illinois Insurance Fraud Act").

127.     Subsection 5(a) of the Illinois Insurance Fraud Act provides for a civil action against any person who commits the crime of insurance fraud or who knowingly offers or pays "any remuneration directly or indirectly, in cash or in kind, to induce any person to procure clients or patients to obtain services or benefits under a contract of insurance or that will be the basis for a claim against an insured person or the person's insurer." 740 Ill. Comp. Stat. §92/5(a).

128.     Pursuant to 720 Ill. Comp. Stat. §5/46-1 of the Illinois Criminal Code, a person commits the offense of insurance fraud when he: "knowingly obtains, attempts to obtain, or causes to b e obtained, by deception, control over property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company."

129.     Subsection 15(a) of the Illinois Insurance Fraud Act provides for a qui tam civil action in order to create incentives for private individuals who are aware of fraud against insurers to help disclose and prosecute the fraud.  Subsection 15(a) provides: "An interested person may bring a civil action for a violation of this Act for the person and the State of Illinois.  The action shall be brought in the name of the State." 740 Ill. Comp. Stat. §92/15(a).

130.     By virtue of the acts described above, Defendants Omnicare and Lancaster committed the following acts, or aided and abetted the commission of the following acts, in violation of the Illinois Insurance Fraud Act:

– 32 –

a.    Defendants Omnicare and Lancaster knowingly offered or paid

remuneration directly or indirectly, in cash or in kind, to induce others

persons to procure clients or patients to obtain services or benefits under a

contract of insurance or that would be the basis for a claim against an

insurer, in violation of 740 Ill. Comp. Stat. §92/5(a).

b.    Defendants Omnicare and Lancaster knowingly obtained, attempted to

obtain, and caused to be obtained, by deception, control over the property

of an insurance company or self-insured entity by the making of a false

claim or by causing a false claim to be made on any policy of insurance

issued by an insurance company, in violation of 740 Ill. Comp. Stat.

§92/5(b) and 720 Ill. Comp. Stat. §5/46-1(a).

131.    Each prescription that was dispensed as a result of Defendants' illegal

inducements represents a false or fraudulent record.  And, each claim for reimbursement

for such prescriptions submitted to a health care insurer represents a false or fraudulent

claims for payment.

132.    Relator Nehls cannot at this time identify all of the false claims for

payment that were caused by Defendants' conduct.  The false or fraudulent claims were

presented by multiple separate entities across the State.  Relator Nehls has no control

over or dealings with such entities and has no access to the records in their possession.

133.    Private entities, unaware of the falsity of the records, statements and

claims made or caused to be made by Defendants Omnicare and Lancaster, paid and

continue to pay the claims that would not be paid but for Defendants' unlawful conduct.

134.    The Illinois State Government is entitled to receive three times the amount

of each claim for compensation submitted by Defendants Omnicare and Lancaster in violation of 740 Ill. Comp. Stat. §92. Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## PRAYER FOR RELIEF

**WHEREFORE,** Relators request that judgment be entered against Defendants, ordering that:

a. Defendants cease and desist from violating the Federal False Claims Act, 31 U.S.C. § 3729 et seq., the Florida False Claims Act, sections 68.081 et seq., Florida Statutes, the Illinois Whistleblower Reward and Protection Act, 740 Ill. Comp. State. §175/1 et seq., and the Illinois Insurance Claims Frauds Prevention Act, 740 Ill. Com. Stat. §92;

b. Defendants pay an amount equal to three times the amount of damages the United States and the States of Florida and Illinois have sustained because of Defendants' actions, plus a civil penalty against Defendants of not less than $5,500, and not more than $11,000 for each violation of 31 U.S.C. § 3729 and not less than $5,000, and not more than $10,000 for each violation of the Florida and Illinois statutes;

c. Relators be awarded the maximum amount allowed pursuant to 31 U.S.C. § 3730(d), section 68.085, Florida Statutes, and 740 ILCS section 92/25;

d. Relators be awarded all costs of this action, including attorneys' fees, expenses, and costs pursuant to 31 U.S.C. § 3730(d) and the comparable provisions of the State statutes;

e. The United States, the States of Florida and Illinois, and Relators be granted all such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Relators hereby demand a trial by jury.

Dated: August 1, 2008

By: _____

Keith E. (Chuck) Roberts, Jr. #6186216
ROBERTS AND ASSOCIATES PC
104 East Roosevelt Road, Suite 202
Wheaton, Illinois 60187
chuckroberts@roberts-law.com
Telephone: (630) 668-4211


PHILLIPS & COHEN LLP
Mary Louise Cohen
mlc@phillipsandcohen.com
Peter W. Chatfield
peter@phillipsandcohen.com
Timothy P. McCormack
tmccormack@phillipsandcohen.com
2000 Massachusetts Avenue, NW
Washington, DC 20036
Telephone: (202) 833-4567

COUNSEL FOR *QUI TAM* PLAINTIFFS