# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, and the STATES OF FLORIDA and ILLINOIS *ex rel* MAUREEN NEHLS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 05777 |
| v. | ) ) | |
| OMNICARE, INC., MORRIS ESFORMES, AND PHILIP ESFORMES, | ) ) ) ) | Judge John J. Tharp, Jr. |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

*Qui tam* plaintiff Maureen Nehls (the "relator") brought this action against Morris Esformes and Philip Esformes (the "Esformeses") to recover damages and civil penalties on behalf of the United States and the States of Illinois and Florida. Nehls contends that the Esformeses violated the False Claims Act ("FCA"), 31 U.S.C. §§ 3729, *et seq.*, the Anti-Kickback Statute ("AKS"), 42 U.S.C. § 1320a-7b(b), and parallel state statutes, by accepting remuneration to induce referrals for services reimbursed by Medicare and Medicaid, and thereby causing Total Pharmacy and Omnicare to submit false claims to the Illinois and Florida Medicaid programs. The allegedly false claims consist of certifications by Total Pharmacy and Omnicare (which acquired Total Pharmacy) that they had complied with all applicable laws when, in actuality, the pharmacy services for which the companies sought reimbursement had been secured, allegedly, through violations of the AKS. Related claims against Omnicare have ended in settlement. Now before the Court are the relator's motion to dismiss Philip Esformes' counterclaim, the Esformeses' motions for summary judgment, and the Esformeses' motion to

strike the relator's 56.1 Statement of Additional Facts. For the reasons set forth below, the relator's motion to dismiss is granted, the Esformeses' motions for summary judgment are denied, and the Esformeses' motion to strike is denied.

## I.    BACKGROUND

### A. Procedural

On October 9, 2012, the relator filed her Sixth Amended Complaint pursuant to this Court's order. *See* Am. Compl., Dkt. 218; Order, Dkt. 216. That complaint alleges that Omnicare, Morris Esformes, and his son, Philip Esformes, violated the FCA, the Illinois Whistleblower Reward and Protection Act, 740 ILCS § 175/3(a)(1)-(3), the Illinois Insurance Claims Fraud Prevention Act, 740 ILCS 92/1 *et seq.,* and the Florida False Claims Act, Section 68.082(2)(a)-(C), Florida Statutes. Omnicare's involvement in this matter has ended in settlement. *See* Order of Dismissal, Dkt. 307. Morris and Philip[1] answered the amended complaint on October 30, 2012 and January 4, 2013, respectively. *See* Morris's Answer, Dkt. 220; Philip's Answer, Dkt. 232. In his answer, Philip denied the allegations against him and also asserted a counterclaim alleging that the relator had breached her fiduciary duty by failing to report the alleged FCA and AKS violations to Total Pharmacy and its owners. *See* Philip's Answer, Dkt. 232 at 41-45.

On January 25, 2013, the relator filed a motion to dismiss Philip's counterclaim. Pl. Mot., Dkt. 233. Soon after, Morris and Philip filed motions for summary judgment with their respective statements of uncontested facts pursuant to Northern District of Illinois Local Rule 56.1. *See* Morris's Mot. for Summ. J., Dkt. 242; Philip's Mot. for Summ. J., Dkt. 236. For her

---

[1] For clarity, the Court refers to the Esformeses by their given names, Morris and Philip, for the remainder of this Order.

part, the relator opted to file a combined responsive brief and statement of additional facts that addressed both motions. *See* Pl. Resp., Dkt. 253; Pl. 56.1 Statement of Additional Facts, Dkt. 256.

At the outset, the defendants contend that Nehls' statement of additional facts does not comply with Local Rule 56.1(b)(3)(C) and have moved to strike Nehls' statement of additional facts. *See* Defs. Mot. to Strike, Dkt. 258. In particular, the Esformeses contend that the relator's statement of additional facts "contains significant amounts of argument, characterization, speculation, and inadmissible hearsay." *Id.* at 2. Further, the defendants argue that Nehls violated the local rules, which limit a nonmoving party's statement of additional facts to 40 paragraphs, by including 77 numbered paragraphs in her brief. *Id.*

The motion to strike is unnecessary. First, both of the defendants filed responses to Nehls' statements and so had a full opportunity to spell out their problems with her fact contentions. *See* Morris's 56.1 Resp., Dkt. 265; Philip's 56.1 Resp., Dkt. 261. And further, while the defendants are correct that it is improper to include "irrelevant information, legal arguments, and conjecture" in a Local Rule 56.1 statement, *see, e.g., Cady v. Sheahan,* 467 F.3d 1057, 1060 (7th Cir. 2006), a review of Nehls' statement of additional facts demonstrates that striking all, or even some, of her brief is unwarranted. For example, the defendants claim that paragraph seven of Nehls' statement of additional facts contains "unjustifiable mischaracterizations of facts and testimony" and the "[r]elator's personal beliefs as to the mental states and reasoning as to the speaker or actor." Defs. Mot. to Strike, Dkt. 258 at 3. A review of paragraph seven, however, reveals no such mischaracterization of facts and testimony alleged by the defendants. *See* Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 7. Paragraph seven merely sets forth, in a straight forward manner, the content of a portion of a legal opinion pertaining to the structure of

3

the pharmacy services company that became Total Pharmacy. Similarly, the defendants contend that paragraph 12 contains "blatant argument," paragraph 15 is a "complete fabrication[]," and that paragraphs 12 and 15 both contain "unjustifiable mischaracterizations of facts and testimony." Defs. Mot. to Strike, Dkt. 258 at 3. However, a review of those statements of facts belies the defendants' contentions. Paragraph 12 is based on and supported by Philip's statement of facts, *see* Philip's 56.1 Statement of Facts, Dkt. 249 at ¶¶ 17-18, and paragraph 15 is based on and supported by Morris's deposition testimony. *See* Morris Dep., Dkt. 256, Ex. F at 24:19-26:2, 42:14-44:20.

That said, the Court agrees that in some statements the relator may have "favorably characterized, rather than plainly stated, several facts." *See In re NeoPharm, Inc. Sec. Litig.,* 705 F. Supp. 2d 946, 963 (N.D. Ill. 2010). For example, in paragraph 38, the relator states that a letter written from Tracy Finn, an Omnicare Vice President, to Tim Dacy, "makes it sound not only as if no deal on Missouri [nursing homes] had been reached, but as if no negotiations had ever taken place." Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 38. That statement is argument, not "fact." Similarly, in paragraph 17, the relator states that "Morris insisted that separate contracts between the Esformes Homes and Total Pharmacy be signed by each nursing home's administrator *because he did not want his name appearing on the contracts with Total Pharmacy.*" *Id.* at ¶ 17. The initial portion of this statement is supported by the deposition testimony of Bruce Paler, to the extent that Paler testified that Morris instructed him to send the contracts to each home and have the administrator sign them. However, whether Morris instructed Paler to act in this manner "because he did not want his name appearing on the contracts" is not a fact, but an inference and characterization of the evidence that is unsupported

4

by record evidence.[2] It may be a permissible inference to argue at trial, but it is plainly not an undisputed fact. To the extent that the relator characterized the evidence presented in her statement, she failed to comply with the Local Rule. These occasional misstatements, however, do not warrant striking the relator's submission, particularly since the defendants have had the opportunity to file responses pointing out where they believe that the relator has taken liberties.

As for the number of the relator's statements, while true that the relator never moved for leave to file more than 40 statements of fact, she responded to two motions for summary judgment in a combined brief. The defendants maintain that the relator must still comply with Local Rule 56.1(b)(3)(C). To that end, the Court agrees and finds that the relator has complied with the Local Rules. The relator had the option of filing separate responses, or even separate statements of additional facts, to each motion for summary judgment, but, to conserve resources and promote efficiency, opted for combined briefs. Counsel for the relator indicated that they would do as much before the Court and the parties, *see* Hr'g, Pl. Resp., Dkt. 253, Ex. 2 at 17, and the combined response and statement of additional facts have in no way prejudiced the defendants. In fact, the relator has used less numbered paragraphs than she is otherwise entitled.

As the defendants correctly note, this Court has the "discretion to require strict compliance with its local rules governing summary judgment." *Koszola v. Bd. of Educ. of City of Chi.,* 385 F.3d 1104, 1109 (7th Cir. 2004). Here, however, the Court finds after a careful review that the relator's statement of additional facts is sufficiently within the "spirit, if not the letter of

---

[2] The relator's testimony on this fact is also inconclusive. She testified that Paler and Dacy gave her a directive that "each contract between Total Pharmacy and the Esformes-Controlled Homes be signed by the administrator of the nursing facility because [Morris] did not want his name appearing on the contracts with Total Pharmacy." Nehls Dep., Dkt. 256, Ex. J, at 249:18-250:24. The testimony is not clear, however, as to whether Morris told Paler that he did not want his name on the contracts or whether that was an inference drawn by Paler and Dacy.

the Local Rule." *See Karlin v. Mauritzon, Inc.,* No. 10 C 07077, 2012 WL 5830592, at *3 n. 5 (N.D. Ill. Nov. 16, 2012) (citing *Portis v. City of Chi.,* 510 F. Supp. 2d 461, 463 (N.D. Ill. 2007)). And to the limited extent any portion of the relator's filing does not meet the requirements of Local Rule 56.1(b)(3)(C), or is based on inadmissible evidence, the Court will disregard those portions of the statement of additional facts. Accordingly, the defendants' motion to strike is denied.

### B. Facts

To avoid unnecessary repetition, an overview of the events and basis for the relator's complaint are presented here, drawing on the parties' Local Rule 56.1 statements of facts. More detailed facts are presented and analyzed below, in the Court's review of the relator's evidence. Moreover, as required on a motion for summary judgment, the record is viewed in the light most favorable to the nonmoving party, Nehls, and all reasonable inferences are construed in her favor. *See Kawasaki Kisen Kaisha, Ltd. v. Plano Molding, Co.,* 696 F.3d 647, 651 (7th Cir. 2012).

In May 2002, Philip, Bruce Paler, and Tim Dacy formed Total Ancillary Services, LLC. Philip's 56.1 Statement of Facts, Dkt. 249 at ¶¶ 2-3; Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 1. Dacy owned 51% of Total Ancillary Services, Paler owned 9%, and Philip owned 40%. Philip's 56.1 Statement of Facts, Dkt. 249 at ¶ 2. Total Pharmacy of Illinois was also formed in May 2002. *Id.* at ¶ 3. Total Ancillary Services owned 50% of Total Pharmacy of Illinois, and Lifeline, a company owned by John Gyann, owned the other 50%. *Id.* Total Pharmacy of Florida was formed in August 2002 and, in November 2002, Total Ancillary Services became its sole owner. *Id.* at ¶ 4 n. 1. For clarity, and as the parties have done in their briefs, the Court refers to these companies collectively as "Total Pharmacy."

At the time Total Pharmacy was formed, Morris had an ownership interest in 27 nursing homes in Illinois and Florida (the "Esformes Homes"). Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 2. Philip had an ownership interest in 13 of those homes. *Id.* The relator contends, and the defendants dispute, that Paler, Dacy, and Philip formed Total Pharmacy with the intention of securing business from the Esformes Homes, and in fact, gave Philip his equity interest in Total Pharmacy to induce referrals of that business. *See, e.g., id.* at ¶ 3.

Before Total Pharmacy was formed, Morris hosted a meeting at his office with Paler, Dacy, and Philip to discuss Total Pharmacy's anticipated structure. *Id.* at ¶ 4. Morris then commissioned a legal opinion that opined on that structure's compliance with the AKS. *Id.* In general, that legal opinion cautioned that the structure could potentially violate the AKS, and strongly recommended that Total Pharmacy meet the requirements of the "Small Entity Investment Interests" safe harbor, 42 C.F.R. § 1001.952(a)(2)(i), by limiting Philip's equity stake in Total Pharmacy to 40% and Total Pharmacy's referrals from the company's investors to 40% of the company's gross revenue (*i.e.,* the "60/40 test"). *Id.* at ¶¶ 5-7. Despite the legal opinion, 27 of the 29 nursing homes to which Total Pharmacy provided services were Esformes Homes. *Id.* at ¶¶ 10, 16.

Moreover, Morris caused the nursing homes in which he had an ownership interest to abandon their current pharmacy service providers and switch to Total Pharmacy in a single decision. *Id.* at ¶ 13. Morris testified that, in making that decision, "the primary issue after we got past [whether Total Pharmacy could fulfill the needs for his buildings] was [his] son." *Id*. Morris also testified that he had no complaints about the pharmacies that had been providing service to the nursing homes prior to switching to Total Pharmacy. *Id.* at ¶ 15. In addition to switching the Esformes Homes to Total Pharmacy, Morris testified that he also contacted other nursing home

owners about using Total Pharmacy, including Sharo Shirshekan who owned 17 nursing homes in Missouri (the "Missouri Homes"). *Id.* at ¶¶ 18, 43.

In 2004, Sam Enloe, the head of Omnicare's Chicago business, proposed purchasing Total Pharmacy as a means of meeting his performance goal of expanding Omnicare's business by 10% annually. *Id.* at ¶ 23. On January 30, 2004, Enloe and Joel Gemunder, Omnicare's then-CEO, met with Dacy and Morris to discuss Omnicare's interest in purchasing Total Pharmacy. *Id.* at ¶ 27. The relator contends that Morris hosted and attended at least two meetings between Omnicare and Total Pharmacy, although the defendants dispute the level of Morris's involvement in those meetings. *See id.* at ¶¶ 27, 34.

On February 2, 2004, Tracy Finn, Omnicare's Vice President of Business Development, called Dacy to follow up on the January meeting. *Id.* at ¶ 31. After that call, Finn testified that it was unclear to him what the status of Total Pharmacy's plans was to develop business in Missouri. *Id.* In a written offer dated March 7, 2004, Omnicare then offered to purchase Total Pharmacy for $16-18 million. *Id.* at ¶ 32. That offer did not factor in any business with Missouri nursing homes. *Id.* The owners of Total Pharmacy, including Philip, discussed Omnicare's offer, were "extremely disappointed" with it, and rejected it within ten minutes of receiving it. *Id.* at ¶ 33.

On March 29, 2004, Gemunder, Finn, and Dacy met at Morris's office again. *Id.* at ¶ 34. Morris participated in at least part of the meeting. *Id.* But according to the defendants, Morris "was only present at the beginning of the meeting, long enough to 'exchange pleasantries.'" Morris's 56.1 Response, Dkt. 265 at 22. During this meeting, Omnicare raised its offer to $25 million. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 35. This offer, however, factored in business with the Missouri Homes. *Id.* Total Pharmacy agreed, and the parties reached an

agreement "in principle." *Id.* at ¶ 36. The relator contends, and the defendants dispute, that Total Pharmacy had not finalized any agreements to provide pharmacy services to the Missouri Homes as of the March 29 meeting. *See, e.g., id.* at ¶ 37.

In a letter dated April 12, 2004, Finn of Omnicare wrote to Dacy of Total Pharmacy, stating in part "[o]nce you have had the opportunity to finalize details in Missouri, including the execution of related agreements, we would then be in a position to provide you with a detailed indication of interest, which hopefully will provide a mutually agreeable basis by which a transaction can be reached." *Id.* at ¶ 38. Dacy testified that he was confused by the letter "because [they] had already had an agreement at the end of March, and [the letter] sounds like [they] just met…and shook…hands." *Id.* at ¶ 39. When asked at his deposition about the purpose of the letter, Finn testified that he could not offer an explanation without revealing advice of counsel. *Id.* at ¶ 40.

In an agreement dated April 1, 2004, Shirshekan committed the 17 nursing homes he owned in Missouri to Total Pharmacy. *Id.* at ¶ 43. While the agreement is dated April 1, however, Shirshekan's lawyer, Richard Watters, testified that he was most likely still making revisions to that agreement throughout April. *Id.* at ¶ 44. In any event, Dacy testified that when the agreement was signed, Total Pharmacy did not have a license to operate a pharmacy in Missouri. *Id.* at ¶ 45. Further, Shirshekan testified that he only agreed to go with Dacy's pharmacy because Dacy had told Shirshekan that Sam Enloe was going to be involved in the business, and Shirshekan knew Enloe from previous work. *Id.* at ¶ 48. Ultimately, Shirshekan testified that Total Pharmacy's agreement with the Missouri Homes was assigned to Omnicare before Total Pharmacy provided any services to those homes. *Id.* at ¶ 49.

Further, the relator contends that in the run up to Omnicare's acquisition of Total Pharmacy, Morris and Philip caused the contracts with the Esformes Homes to be renegotiated from one-year contracts, cancelable with 30-day notice, to five-year contracts, cancelable only for cause. *Id.* at ¶¶ 56, 58, 65. Moreover, while the original one-year contracts could not be assigned, the new five-year contracts included an assignment provision. *Id.* at ¶ 66. In his deposition, Morris did not explain why he had committed his homes to the new five-year contracts and could think of no benefit inuring to the nursing homes as a result of the contracts. *Id.* at ¶ 68.

From Philip's initial contribution of $4,000 for his 40% stake in Total Pharmacy, he earned $400,000 in distributions and a little over $7 million in proceeds from Total Pharmacy's sale to Omnicare, just two years after Total Pharmacy was formed. *Id.* at ¶ 20. Further, after Omnicare had acquired Total Pharmacy, Morris testified that he had solicited and received donations for a religious school that he built from Dacy in the amount of $510,000 and Paler in the amount of $290,000. *Id.* at ¶ 21.

## II.    ANALYSIS

### A.  Original Source of Information

Before the Court considers whether the relator has adduced sufficient evidence to support her claims, it must deal with a threshold jurisdictional issue raised by the defendants. Specifically, the Esformeses contend that Nehls "is not the original source of the allegations in the Sixth Amended Complaint," and therefore, "should not be permitted to proceed to trial." Philip's Mot. for Summ. J., Dkt. 250 at 21. To be sure, this issue may turn on disputed facts, but it is a jurisdictional issue, and therefore one to be decided by the Court, rather than a jury. *See, e.g., Pavey v. Conley,* 544 F.3d 739, 741 (7th Cir. 2008) ("Yet the defendants are right that not

every factual issue that arises in the course of a litigation is triable to a jury as a matter of right,

even if it is a suit at law (rather than in equity) within the meaning of the Seventh Amendment.

The clearest example is subject-matter jurisdiction; often it turns on factual issues that may be

genuinely debatable, but even if so the issues are resolved by the judge." (citations omitted)).

Section 3730(e)(4)(A) of the FCA, also known as the "public disclosure bar," provides

that:

> No court shall have jurisdiction over an action under this section based upon public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of information.[3]

*See also United States v. Nicor Gas, Inc.,* No. 09 C 00298, 2013 WL 1787817, at *2 (N.D. Ill.

Apr. 25, 2013) ("[*Q*]*ui tam* actions are subject to [a] jurisdictional bar when a relator's action is

'based upon the public disclosure of allegations." (citation omitted)). In considering whether

§ 3730(e)(4)(A) applies, the Court must determine "whether the relator's allegations have been

---

[3] Section 3730(e)(4)(A) was amended by the Patient Protection and Affordable Care Act ("PPACA"), 124 Stat. 119, 901-902 as of March 23, 2010. Following that amendment, § 3730(e)(4)(A) now states:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed…(i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party…(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or…(iii) from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of information.

The amendment—which arguably might affect a determination of whether the disclosure bar is jurisdictional, and therefore, whether it can be waived—is not retroactive, s*ee Graham Cnty. Soil and Water Conservation Dist. v. United States ex rel. Wilson,* 559 U.S. 280, 283 n.1 (2010), and therefore, the Court quotes from the version of § 3730(e)(4)(A) in force in 2007, when this case was filed. Under the 2007 version of the statute, the bar is plainly jurisdictional.

publicly disclosed…if so, whether the law suit is 'based upon' such public disclosures…and…if so, whether the relator is an 'original source' of information contained within the public disclosures." *United States ex rel. Feingold v. AdminaStar Fed., Inc.,* 324 F.3d 492, 494 (7th Cir. 2003) (citation omitted). A "public disclosure" occurs "when the critical elements exposing the transaction as fraudulent are placed in the public domain." *Id.* at 495 (citing *United States ex rel. Rabushka v. Crane Co.,* 40 F.3d 1509, 1512 (8th Cir. 1994); *United States ex rel. Springfield Terminal Ry. Co. v. Quinn,* 14 F.3d 645, 654 (D.C. Cir. 1994)).

To that end, Philip avers that on August 20, 2004, Adam Resnick alleged that wrongdoing was occurring at Total Pharmacy during an interview with the Federal Bureau of Investigation ("FBI"). *See* Philip's 56.1 Statement of Facts, Dkt. 249 at ¶ 11. This interview occurred more than a year before the relator filed this *qui tam* action, alleging that the formation of Total Pharmacy and its acquisition by Omnicare were improper. *Id.* at ¶ 23. However, Philip's evidence falls well short of the showing required under § 3730(e)(4)(A). There is no indication, and the defendants have not presented evidence to show, that Resnick's allegations made during the FBI interview were publicly disclosed prior to the filing of this suit and in the "public domain," even assuming those allegations contained the "critical elements" of the FCA claims at issue here. *See, e.g., Glaser v. Wound Care Consultants, Inc.,* 570 F.3d 907, 913-14 (7th Cir. 2009) ("[The relator] correctly notes that mere governmental awareness of wrongdoing does not mean a public disclosure occurred." (citing *United States v. Bank of Farmington,* 166 F.3d 853, 860 n. 5 (7th Cir. 1999), *overruled on other grounds by Glaser,* 570 F.3d 907)).

Further, even if the allegations were in the public domain, Nehls qualifies as "an original source of information." On this point, the defendant misconstrues the requirements of § 3730(e)(4)(A) as requiring the suit to be filed by *the* original source of information, rather than

*an* original source of information. *See, e.g.,* Philip's Reply, Dkt. 260 at 14 ("The original source of information in the complaint is Adam Resnick. It is undisputed that Relator is not the original source of the information in the complaint."). But the Seventh Circuit has explained that an "original source" is a person with "direct and independent knowledge of the information on which the allegations are based." *Leveski v. ITT Educ. Srvs., Inc.,* No. 12-1369, 12-2008, 12-1967, 12-2891, 12-1979, 2013 WL 3379343, at \*18 (7th Cir. July 8, 2013) (citing 31 U.S.C. § 3730(e)(4)(B)). And while "[o]riginal sources should be independently aware of some essential piece of information, [he or she] need not have direct knowledge of all of the vital ingredients in a fraudulent transaction." *United States ex rel. Lamers v. City of Green Bay,* 998 F. Supp. 971, 982 (E.D. Wis. 1998), *aff'd,* 168 F.3d 1013 (7th Cir. 1999).

Here, it is undisputed that Nehls is a former employee of Total Pharmacy. In her deposition, Nehls also testified that she knew Philip owned 40% of Total Pharmacy, was aware that nearly all of Total Pharmacy's customers were owned by the Esformeses, and that the contracts with those Esformeses-owned nursing homes were lengthened, and the Missouri business secured, after negotiations with Omnicare began. *See* Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶¶ 75-76 *see also* Morris's 56.1 Statement of Facts, Dkt. 247 at ¶ 52 ("Nehls was on Total Pharmacy's compliance committee."), ¶ 55 ("Nehls knew that Philip Esformes owned a share of Total Pharmacy and that the bulk of Total Pharmacy's business came from nursing homes Morris Esformes owned and in which Philip, in some instances, had a stake.").

These facts are sufficient to show that Nehls is an original source of information concerning the allegations of this case, *i.e.,* she has "direct and independent knowledge of the information on which the allegations are based." Accordingly, the Court has jurisdiction over

this matter, and the defendants' motion for summary judgment pursuant to § 3730(e)(4)(A) is denied.[4]

### B. Esformeses' Motions for Summary Judgment

The relator contends that Morris and Philip caused Total Pharmacy and Omnicare to file false claims with the Illinois and Florida Medicaid programs because those claims sought reimbursement for pharmacy services procured as a result of Morris's and Philip's violations of the AKS. Pl. Resp., Dkt. 253 at 18. As the relator points out, the defendants do not contest that both Total Pharmacy and Omnicare sought reimbursement for pharmacy services from the Medicaid programs, in which both companies filed claims certifying that they had complied with all applicable laws. The inquiry then is whether the relator has presented sufficient evidence to create triable issues of fact as to whether Morris and Philip violated the AKS and caused the certifications of compliance to be false, thereby violating the FCA.

### 1. *Interplay Between the False Claims Act and the Anti-Kickback Statute*

The FCA imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment for approval" by the government, or who conspires to do so. 31 U.S.C. § 3729(a)(1)(A), (C). "To establish a claim under [§ 3729(a)(1)(A)], 'a relator must prove three elements: (1) a false or fraudulent claim; (2) which was presented, or caused to be presented, by the defendant to the United States for payment or approval; (3) with the knowledge that the claim was false.'" *United States ex rel. Fowler v. Caremark RX, LLC,* 496 F.3d 730, 740-41 (7th Cir. 2007) (citing *United States ex rel. Walker v.*

---

[4] Because this is a jurisdictional issue for the Court, no evidence the relevance of which goes only to whether the allegations forming the basis for the claims in this matter were publicly disclosed or whether Nehls is an "original source of information" may be presented at trial.

*R & F Prop. of Lake Cnty., Inc.,* 433 F.3d 1349, 1355 (11th Cir. 2005)), *overruled on other grounds by Glaser,* 570 F.3d 907. The FCA states that:

> the terms "knowing" and "knowingly"—(A) mean that a person, with respect to information—(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information; and (B) require no proof of specific intent to defraud.

31 U.S.C. § 3729(b)(1).

A claim for conspiracy to violate the FCA is subject to general civil conspiracy principles. *See United States v. Durcholz v. FKW Inc.,* 189 F.3d 542, 545 n. 3 (7th Cir. 1999) ("The FCA provides for conspiracy claims…and general civil conspiracy principles apply." (internal citation omitted)). Therefore, "[a] claim of civil conspiracy requires the [relator] to prove that two or more people entered into an agreement to accomplish an unlawful purpose (or a lawful purpose by unlawful means), committed an overt act in furtherance of the agreement, and caused injury to another." *Ellsworth v. URS Constr. Srvs.,* No. 04 C 03499, 2005 WL 608240, at *6 (N.D. Ill. Mar. 11, 2005) (citing *Snap-On, Inc. v. Ortiz,* No. 96 C 02138, 1999 WL 592194, at *11 (N.D. Ill. Aug. 3, 1999)); *see also Adcock v. Brakegate,* 164 Ill. 2d 54, 645 N.E.2d 888, 894 (Ill. 1994)).

Moreover, "[t]he FCA places liability not only on persons who cause false claims to be submitted…but also on those who cause the claims…to be false in the first place." *Mason v. Medline Indus., Inc.,* 731 F. Supp. 2d 730, 738 (N.D. Ill. 2010) (citing 31 U.S.C. § 3729(a)(1) & (2); *United States v. Bornstein,* 423 U.S. 303, 313 (1976); *United States ex rel. Marcus v. Hess,* 317 U.S. 537, 539-43 (1943)); *see also id.* ("The wealth of case law supports the proposition that the FCA reaches claims that are rendered false by one party, but submitted to the government by another." (citing *Bornstein,* 423 U.S. at 313; *Hess,* 317 U.S. at 539-43; *United States v. Rivera,*

55 F.3d 703, 706-07 (1st Cir. 1995) (defendant caused a third party to submit false claims, although the claims may not have been false or fraudulent from third party's perspective); *United States ex rel. Kennedy v. Aventis Pharms., Inc.,* 610 F. Supp. 2d 938, 943–44 (N.D. Ill. 2009) (Kennelly, J.); *In re Pharm. Indus. Average Wholesale Price Litig.,* 491 F. Supp. 2d 12, 15–16 (D. Mass. 2007); *United States ex rel. Fry v. Guidant Corp.,* No. 3:03–0842, 2006 WL 2633740, at *11–12 (M.D. Tenn. Sept. 13, 2006); *United States v. Inc. Vill. of Island Park,* 888 F. Supp. 419, 440 (S.D.N.Y. 1995)); *see also United States ex rel. Lisitza v. Par Pharm. Cos., Inc., et al.,* No. 06 C 06131, 2013 WL 870623, at *4 (N.D. Ill. Mar. 7, 2013) ("To be liable for 'causing' false claims, a defendant must 'knowingly *assist* in causing the government to pay claims which were grounded in fraud'" (citation omitted)).

"An FCA claim premised on an alleged false certification of compliance with statutory…requirements," as the claims are here, "also requires that the certification of compliance be a condition of or prerequisite to government payment." *United States ex rel. Crews v. NCS Healthcare of Ill., Inc.,* 460 F.3d 853, 858 (7th Cir. 2006) (citing *United States ex rel. Gross v. AIDS Research Alliance-Chicago,* 415 F.3d 601, 604 (7th Cir. 2005)). As the relator notes and this Court previously determined, compliance with the AKS, which the relator contends the Esformeses violated, is a condition of reimbursement from Medicaid programs. *See United States ex rel. Nehls v. Omnicare,* No. 07 C 05777, 2011 WL 1059148, at *3 (N.D. Ill. Mar. 21, 2011) (St. Eve, J.) (holding that Nehls stated a claim upon which relief can be granted (citing *United States v. Rogan,* 517 F.3d 449, 452 (7th Cir. 2008); *see also United States v. Rogan,* 459 F. Supp. 2d 692, 724 (N.D. Ill. 2006), *aff'd,* 517 F.3d 449 ("[The AKS] clearly provide[s] that compliance with [its] terms is a condition of payment under the Medicaid programs. The United States would not have paid the claims if it had known the claims were

false (in claiming statutory compliance) because compliance with the…[AKS] is a statutory condition of payment."); *United States ex rel. Pogue v. Diabetes Treatment Ctrs. of Am.,* 565 F. Supp. 2d 153, 159 (D.D.C. 2008) ("Legion other cases [sic] have held violations of AKS…can be pursued under the FCA, since they would influence the Government's decision of whether to reimburse Medicaid claims. (citations omitted); *United States ex rel. Bidani v. Lewis,* 264 F. Supp. 2d 612, 616 (N.D. Ill. 2003) ("Compliance with the AKS is thus central to the reimbursement plan of Medicare.")). Accordingly, in order to prove her FCA claims, Nehls must also show that the Esformeses violated the AKS.

The AKS provides that:

whoever knowingly and willfully solicits or receives any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind—(A) in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program, or, (B) in return for purchasing, leasing, ordering, or arranging for or recommending purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony.

42 U.S.C. § 1320a-7b(b)(1)(A)-(B). Moreover, the AKS is violated not only if the "primary motivation of [the] remuneration" was to induce referrals, but merely "if 'one purpose of the payment was to induce future referrals.'" *United States v. Borrasi,* 639 F.3d 774, 782 (7th Cir. 2011) (quoting *United States v. Greber,* 760 F.2d 68, 69 (3d Cir. 1985); citing *United States v. McClatchey,* 217 F.3d 823, 835 (10th Cir. 2000)).

As stated above, to violate the AKS, a person must act "knowingly and willfully," which courts have generally viewed as a "heightened *mens rea* standard." *See, e.g., United States ex rel. Kosenske v. Carlisle HMA, Inc.,* No. 1:05-CV-2184, 2010 WL 1390661, at *10 (M.D. Pa. Mar. 31, 2010) ("The general view…is that proof that a defendant knowingly violated the [AKS]

17

requires satisfaction of a 'heightened *mens rea* standard." (citing *United States v. Jain,* 93 F.3d 436, 441 (8th Cir. 1996)). However, the Court also notes the relator's contention that the AKS's scienter requirement, when used as a predicate for an FCA violation, is not a clear-cut issue. *See* Pl. Resp., Dkt. 253 at 25 n. 8. As the relator points out, courts in other districts have held that "[a] violation of the AKS under the FCA must have been made knowingly, which can be proven by actual knowledge, deliberate ignorance, or reckless disregard," *i.e.,* the FCA scienter standard, as a opposed to the heightened scienter requirement of "knowingly and willfully." *Pogue,* 565 F. Supp. 2d at 167 (internal quotation marks and citation omitted); *see also Kosenske,* 2010 WL 1390661 at *11 ("A violation of the [AKS] under the FCA must have been made knowingly, which can be proven by actual knowledge, deliberate ignorance, or reckless disregard." (quotation marks omitted) (citing *United States ex rel. Pogue v. Diabetes Treatment Ctrs of Am.,* 238 F. Supp. 2d 258, 266 (D.D.C. 2002)).

Indeed, the Seventh Circuit has not opined on this specific issue, but has noted "that willfulness can have varying meanings depending on the context." *United States v Simmons,* 163 Fed. Appx. 403, 406 (7th Cir. 2006) (citing *Bryan v. United States,* 524 U.S. 184, 191 (1998) (holding that "willful" in the context of 18 U.S.C. § 924(a)(1)(D) requires a showing of "knowledge that the conduct is unlawful," not that it violates a particular statute)). The defendants cite cases from the Tenth and Eleventh Circuits which hold that an AKS violation requires the defendant to have acted "specifically intend[ing] to do something the law forbids." *United States v. McClatchey,* 217 F.3d at 829; *see also United States v. Stark,* 157 F.3d 833, 837-39 (11th Cir. 1999) (affirming jury instruction defining "willfully" as meaning "the act was committed voluntarily and purposefully, with the specific intent to do something the law forbids, that is with a bad purpose, either to disobey or disregard the law"); *id.* at 838 (rejecting the

argument that the AKS requires knowledge of § 1320a-7b(b)). For her part, the relator has averred, and as explained below, the Court agrees, that she has presented evidence sufficient to meet this heightened scienter requirement. *See* Pl. Resp., Dkt. 253 at 25 n. 8. Accordingly, this dispute does not need to be resolved definitively to rule on the defendants' motions for summary judgment; the Court will assess the motions applying the heightened standard cited by the defendants.

In general, the Esformeses contend that they are entitled to summary judgment because Nehls has failed to marshal sufficient admissible evidence to prove her FCA claims at trial. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on files, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Parent v. Home Depot U.S.A., Inc.,* 694 F.3d 919, 922 (7th Cir. 2012) (citing Fed. R. Civ. P. 56(c)). Moreover, "the plain language of Rule 56(c) mandates the entry of summary judgment…against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)).

The Court now turns to whether the relator has adduced sufficient evidence to show that Morris and Philip violated the AKS during the formation of Total Pharmacy and Omnicare's acquisition of Total Pharmacy. Each defendant has filed a separate motion for summary judgment. Further, both defendants aver that, in responding to their motions, the relator failed to present individualized evidence that differentiated between the two defendants. *See* Morris's Reply, Dkt. 264 at 4; Philip's Reply, Dkt. 260 at 3. Accordingly, the Court addresses each defendant's motion in turn.

2. *Philip Esformes*

The relator has presented sufficient admissible evidence to create a triable issue of fact as to whether Philip knowingly and willfully received remuneration in exchange for referrals, or conspired to receive remuneration in exchange for referrals, in connection with Total Pharmacy's formation and Omnicare's acquisition of Total Pharmacy. First, the relator has presented evidence that creates a factual dispute as to whether Philip received an equity interest in Total Pharmacy in exchange for referring the nursing homes owned by the Esformes family when the company was formed in 2002.

Specifically, Philip received a 40% stake in Total Pharmacy by paying $4,000 of the $10,000 used to form the limited liability company. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 11. Dacy and Paler, who owned 51% and 9% of Total Pharmacy, respectively, testified that they had included Philip in the business venture because "they had done business together in the past" and Philip "was a hard worker and skilled marketer." *Id.* at ¶ 12. However, Paler also testified that they brought Philip in to use his connections to bring in more business, and that they hoped Philip's and Morris's ownership in nursing homes could bring business to Total Pharmacy. *Id.* at ¶ 11 (citing Paler Dep., Dkt. 256, Ex. C at 29:12-32:4). Further, Paler also testified, and Philip acknowledged, that he would be a "passive owner" in the company, not involved in its operations. *Id.* at ¶ 12 (citing Philip's 56.1 Statement of Facts, Dkt. 249 at ¶¶ 17-18). Philip did, however, personally guarantee, along with Paler and Dacy, over $2 million in loans to start Total Pharmacy. *See* Philip's 56.1 Statement of Facts, Dkt. 249 at ¶ 16.

On these facts, it would not be unreasonable for a jury to infer (and so summary judgment is inappropriate) that Philip, who never contributed any additional capital to the company, largely paid for his substantial stake in Total Pharmacy by delivering the Esformes

Homes as customers. After Total Pharmacy was formed, Morris made the decision to cause all of the nursing homes he owned to abandon their current pharmacy service providers and replace them with Total Pharmacy. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 13. In his deposition, Philip could not recall the name of any nursing home that he secured for Total Pharmacy, other than those owned by the Esformes family. *Id.* at ¶ 19. Indeed, Morris, Philip, or both had an ownership interest in 27 of the 29 total nursing homes to which Total Pharmacy provided services. *Id.* at ¶ 12.

The relator has also presented sufficient evidence to create a factual dispute as to whether Philip received remuneration in exchange for securing long-term contracts with the Esformes Homes and Missouri Homes in connection with Omnicare's acquisition of Total Pharmacy in 2004. Specifically, there is admissible evidence sufficient to show that on January 30, 2005, Gemunder met with Dacy to express Omnicare's interest in purchasing Total Pharmacy in Morris's Illinois offices. *Id.* at ¶¶ 27-28; *see also* Philip's 56.1 Statement of Facts, Dkt. 249 at ¶¶ 43-44. Omnicare's first written offer to purchase Total Pharmacy, dated March 7, 2004, did not factor in any Missouri business. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 32. In that offer, Omnicare offered to purchase all of Total Pharmacy's assets and about $7 million in receivables for $16-18 million. *Id.* Paler testified that he discussed the proposal with the owners of Total Pharmacy, including Philip, and they were "extremely disappointed." *Id.* at ¶ 33. They rejected the offer about ten minutes after receiving it. *Id.*

Gemunder, Finn, and Dacy then met again, on March 29, 2004, at Morris's office. *Id.* at ¶ 34; *see also* Morris's 56.1 Statement of Facts, Dkt. 247 at ¶ 35. During this meeting, Omnicare offered to purchase Total Pharmacy for $25 million, which factored in Total Pharmacy delivering business in Missouri. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 35. At the

time Omnicare initiated negotiations to purchase Total Pharmacy, Total Pharmacy did not provide services to any nursing homes in Missouri, nor did Total Pharmacy have a license to operate a pharmacy in Missouri. *Id.* at ¶ 30. In fact, when Total Pharmacy eventually entered into an agreement to provide services to the Missouri Homes, it still had not secured a Missouri license. *See id.* (citing Dacy Dep., Dkt. 256, Ex. B at 142:3-8). Moreover, as of March 29, 2004, Total Pharmacy had not signed any contracts with the Missouri Homes. *Id.* at ¶ 37; *see also* Dacy Dep., Dkt. 256, Ex. B at 140:11-17 (testifying that an exhibit dated April 1, 2004 was the agreement Total Pharmacy had reached with the Missouri Homes). Total Pharmacy accepted the deal on March 29, 2004, and the parties had an agreement "in principle." Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 36.

However, in a letter from Omnicare to Total Pharmacy, dated April 12, 2004—well after the meeting and agreement in principle—Omnicare wrote that "[o]nce [Total Pharmacy has] had the opportunity to finalize details in Missouri, including the execution of related agreements, [Omnicare] would then be in a position to provide you with a detailed indication of interest." *Id.* at ¶ 38. Dacy testified that the April 12 letter didn't make sense to him because the parties had already reached an agreement at the end of March. *Id.* at ¶ 39. When asked about the letter, Finn testified that he could not offer an explanation for the letter without revealing advice of counsel. *Id.* at ¶ 40. Dacy responded to the letter on April 16, 2004, indicating that Total Pharmacy had "finalized [its] expansion plans in Missouri." *Id.* at ¶ 41.

Total Pharmacy's expansion into Missouri was completed with the assistance of Morris, who introduced Total Pharmacy to the owner of the Missouri Homes, Sharo Shirshekan. *Id.* at ¶ 42. Morris testified that he spoke to Shirshekan about going with Total Pharmacy as a "courtesy to his son [Philip]." *Id.* at ¶ 42. Shirshekan then committed the 17 homes he owned in Missouri

22

to Total Pharmacy in a single agreement. *Id.* at ¶ 43. That agreement provided that it could only be assigned to a pharmacy with more than $1 billion in assets. *Id.* at ¶ 46. Finn testified that Omnicare was one of only three pharmacies that met that requirement. *Id.* at ¶ 47. Moreover, neither Paler nor Dacy would provide an explanation for the assignment provision, other than Paler's misunderstanding that it was part of Total Pharmacy's standard agreements. *Id.* Total Pharmacy then assigned its pharmacy service contracts with the Missouri Homes to Omnicare before ever providing services to those homes. *Id.* at ¶ 49.

The relator has also adduced sufficient evidence to show that Philip received remuneration in exchange for securing longer-term and more favorable contracts to each of the nursing homes Total Pharmacy provided services to in Illinois and Florida. When Omnicare first expressed an interest in purchasing Total Pharmacy, Total Pharmacy's contracts with the Illinois and Florida homes were for one year, not assignable, and were cancelable for any reason on 30-day notice. *Id.* at ¶ 50. The relator contends that the length of a service contract was something that Omnicare valued. Enloe testified as much, stating that, when negotiating with clients, the longer the contract Omnicare could get the better. *Id.* at ¶ 53.

Sometime in February, and after the initial meeting with Omnicare in January, Dacy testified that he spoke with the owners of the nursing homes Total Pharmacy provided services to about extending their contracts to five years. *Id.* at ¶ 56. According to Morris, there is no written evidence of the negotiations of the five-year contracts, other than the contracts themselves. *Id.* at ¶ 57. The new contracts, which were signed sometime in March, were for five years, automatically renewed for another five year period, and were only cancelable for cause. *Id.* at ¶ 65. Additionally, unlike the old contracts, the new contracts were assignable. *Id.* at ¶ 66. Dacy testified that he was unsure why the renegotiated five-year contracts had an assignment

provision, while the original contracts did not. *Id.* at ¶ 67. Paler testified that he thought the assignment provision was standard. *Id.* However, examples of contracts provided by the relator indicate that the one-year contracts prohibited assignment. *Id.* (citing Pharmacy Services Agreement, Dkt. 256, Ex. K at 6). When questioned about the five-year contracts, Morris testified that he could not remember why he obligated the homes in which he had an ownership interest to five-year agreements, and was not aware of any benefits that inured to the nursing homes as a result of the new contracts. *Id.* at ¶ 68.

Again, this evidence is sufficient to create an issue for the jury as to whether the sale of Total Pharmacy to Omnicare included payment for referrals—and the economics of the Esformeses' investment in Total Pharmacy buttresses the payment-for-referrals inference significantly. As a consequence of his initial investment of $4,000 in Total Pharmacy in 2002, and Total Pharmacy's sale to Omnicare two years later, Philip earned more than $400,000 in distributions and a little over $7 million in sale proceeds. *Id.* at ¶ 20. A reasonable trier of fact could find, based on this evidence, and in the absence of any evidence providing an alternative explanation for the immediate and total conversion of the Esformes Homes into Total Pharmacy customers, that Philip received his share in Total Pharmacy—ultimately worth some $7.6 million—not in exchange for a capital contribution of $4,000 (which would constitute an annual return on investment of some 4,270%[5]), but for referring the Esformes Homes' business.

---

[5] The Court determined this value using the Compound Annual Growth Rate ("CAGR") formula to calculate the approximate overall return on Philip's initial investment of $4,000 in Total Pharmacy. CAGR is calculated as follows:

$$(\text{Ending Value}/\text{Beginning Value})^{1/n} - 1,$$

where "n" equals the number of years of the investment. According to the relator's facts, Philip received $400,000 in distributions and roughly $7,239,600 in proceeds from Total Pharmacy's (*Continued on next page.*)

As discussed above, however, simply receiving remuneration for referrals may not be sufficient for liability; there is substantial authority for the view that the remuneration must be received "knowingly and willfully"—*i.e.,* with the intent to disobey the law. On this point, and assuming that knowledge of unlawfulness is required, the relator has also adduced sufficient evidence to create a factual dispute. Before Total Pharmacy was formed, Morris hosted a meeting at his office with Philip, Dacy, Paler, and Morris's attorney to discuss the formation of, and Morris' involvement with, Total Pharmacy. *Id.* at ¶ 4. Morris then commissioned a legal opinion from Husch & Eppenberger, LLC, requesting that his attorney opine on "the proposed ownership structure of the limited liability company for compliance with the Anti-kickback statute." *Id.* at ¶ 4 (citing Review of Structure of Ownership of Total Ancillary Services, LLC, Dkt. 256, Ex. D at 1). The legal opinion analyzed the proposal that Philip would own 40%, Dacy would own 51%, and Paler would own 9% of Total Pharmacy. *Id.* at ¶ 5. Further, the opinion assumed that Philip was a minority owner in several Illinois nursing homes which were targeted as customers, Morris also owned a significant stake in those homes, and that Total Pharmacy was developing a marketing strategy to approach a wide range of nursing homes, including the Esformes Homes and independent facilities. *Id.*

The opinion then cautioned that "if an investment opportunity is determined to be nothing more than a payment for the arrangement of referrals to or from the investment company, such a relationship could be subject to scrutiny, and potentially, civil and criminal penalties. *Id.* at ¶ 6. Accordingly, the opinion strongly recommended complying with the "Small Entity Investment

---

sale to Omnicare, in a two-year period. Therefore, the overall return on Philip's initial investment equals:

$$(\$7,639,600/\$4,000)^{1/2} - 1 = 42.70, \text{ or } 4{,}270\%.$$

Interests" safe harbor, 42 C.F.R. § 1001.952(a)(2)(i). *Id.* at ¶ 7. Among other requirements, this safe harbor required that:

> (i) No more than 40 percent of the value of the investment interests of each class of investment interests may be held in the previous fiscal year or previous 12 month period by investors who are in a position to make or influence referrals to, furnish items or services to, or otherwise generate business for the entity. (For purposes of paragraph (a)(2)(i) of this section, equivalent classes of equity investments may be combined, and equivalent classes of debt instruments may be combined.)
>
> …
>
> (vi) No more than 40 percent of the entity's gross revenue related to the furnishing of health care items and services in the previous fiscal year or previous 12–month period may come from referrals or business otherwise generated from investors.

*Id.* Philip admitted that he was advised of this legal opinion. *Id.* at ¶ 9. And despite the legal opinion, as stated above, 27 of the 29 homes that Total Pharmacy served were owned by the Esformeses. The Esformeses argue that based on the legal opinion, they thought Total Pharmacy would be structured to comply with the safe harbor, and that their reliance on the opinion negates any intent to violate the law. That is a jury argument (if permissible at all),[6] and not a strong one at that.

These facts serve as circumstantial evidence demonstrating that Philip acted with willfulness. *See, e.g., United States v. Mousavi,* 604 F.3d 1084, 1092 (9th Cir. 2010) ("[A]wareness of the relevant provisions of the Code or regulations [is] one source of such evidence [of willfulness]." (quotations omitted) (citing *Cheek v. United States,* 498 U.S. 192, 202 (1991)); *United States ex rel. Decesare v. Americare in Home Nursing,* No. 1:05-CV-696, 2011 WL 607390, at *6-7 (E.D. Va. Feb. 10, 2011) (finding that for purposes of determining a motion

---

[6] The relator has moved in limine to bar any assertion of an advice of counsel defense by the defendants. That motion is pending and need not be resolved in order to rule on the defendants' summary judgment motions.

to dismiss, the allegation that the defendant received a letter informing it that it may be violating the AKS but continued on the same course of action, fulfilled the AKS scienter requirement)); *see also Pogue,* 565 F. Supp. 2d at 167 (finding that, for purposes of summary judgment, evidence that the defendant received warnings from counsel about potential AKS violations, but continued to carry out its business as usual, was sufficient to show the defendant had "knowledge" of the AKS violations). Accordingly, the relator has met her burden of production on the scienter requirement, and Philip's motion for summary judgment is denied.

### 3. *Morris Esformes*

The relator has also adduced sufficient admissible evidence to create a triable issue of fact as to whether Morris knowingly and willfully received remuneration in connection with the formation of Total Pharmacy and its sale to Omnicare. As the AKS statute states, "remuneration" may be direct, indirect, overt, covert, in cash, or in kind. *See* 42 U.S.C. § 1320a-7b(b)(1). Moreover, "[r]emuneration, for purposes of the AKS, is defined broadly, meaning 'anything of value.'" *Klaczak v. Consol. Med. Transp.,* 485 F. Supp. 2d 622, 678 (N.D. Ill. 2006); *see also United States v. Shaw,* 106 F. Supp. 2d 103, 114 (D. Mass. 2000) (citing 42 C.F.R. Part 1001, 56 Fed. Reg. 35952-01 (Jul. 29, 1991) ("Congress's intent in placing the term 'remuneration' in the statute in 1977 was to cover the transferring of anything of value in any form or manner whatsoever.")); *see also* 42 C.F.R. Part 1001, 56 Fed. Reg. 35952-01 ("The statute's legislative history supports this reading of the term 'remuneration,' and makes clear that the fundamental analysis required of a trier of fact is 'to recognize that the substance rather than simply the form of a transaction should be controlling.'" (citation omitted)).

In this case, Morris has effectively admitted (or so a jury might reasonably conclude) that one of the reasons that he caused the Esformes Homes to enter into contracts with Total

Pharmacy was to benefit his son.[7] Morris testified that he switched his nursing homes to Total Pharmacy and sought additional business for Total Pharmacy primarily as a "courtesy" to, and out of concern for, his son. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 14; Morris Dep., Dkt. 256, Ex F at 49:7-14. As a result of those efforts, Philip received $400,000 in distributions from Total Pharmacy and over $7 million in proceeds from Omnicare's acquisition of Total Pharmacy.

Morris argues that this economic benefit to his son does not bring him within the scope of the AKS because he did not receive those benefits himself. In making this argument, Morris reads the term remuneration too narrowly; that term includes "anything of value" whether received "directly or indirectly." It is probably true that in the classic AKS case, an economic benefit of some sort inures *to the referral source,* whether that benefit comes in the form of cash, a discount, or even the opportunity to earn revenue. *See, e.g., United States ex rel. Fry v. The Health Alliance of Greater Cincinnati,* No. 1:03-CV-00167, 2008 WL 5282139 (S.D. Ohio Dec. 18, 2008) (holding that the relator adequately pled the "remuneration" element of an AKS violation where the defendant had given physicians "time in the heart station" in exchange for referrals, noting that the government had presented evidence that such a benefit to the physicians was "essentially money"). But direct economic benefit does not delimit the scope of unlawful remuneration under the statute.

Here, the economic benefit inured to the benefit of a member of Morris's immediate family (who also happened to be his business partner in half of the nursing homes Total

---

[7] As explained above, payment for a referral does not have to be the only, or even primary, reason for the remuneration. *See Borrasi,* 639 F.3d at 782 (the AKS is violated not only if the "primary motivation of [the] remuneration" was to induce referrals, but merely "if 'one purpose of the payment was to induce future referrals'") (citations omitted)).

Pharmacy served), and that is sufficient evidence for a jury to reasonably conclude that Morris indirectly benefitted as well (indeed, as noted above, it is a fair inference that he has admitted as much). The Court notes that whether payments to a family member of a referral source qualifies as "remuneration" or something "of value" to that source for purposes of the AKS, appears to be an open question, but cases in the Seventh and other circuit courts interpreting bribery and other analogous laws support the proposition that payments to a family member may constitute a valuable economic benefit to one who arranged for the payment. *See, e.g., United States v. Foxworth,* 334 Fed. Appx. 363, 366-67 (2d Cir. 2009) ("[T]he difference between making checks out to a legitimate campaign and to 'cash' and a family member is highly relevant to the question of whether the payments were bribes or campaign contributions."); *United States v. Kemp,* 500 F.3d 257, 285 (3d Cir. 2007) ("[A]s a legal matter, [the Court] concludes that providing a loan to a public official (or his friends or family) that would have otherwise been unavailable...or available at a higher interest rate may constitute a bribe…[this] conclusion comports with the federal bribery statute, which refers to 'anything of value.'"); *United States v. Frega,* 179 F.3d 793 (9th Cir. 1999) (bribery conviction affirmed under California state law where defendants paid cash and other benefits to judges and the judges' family members); *United States v. Krilich,* 159 F.3d 1020 (7th Cir. 1998) ($40,000 paid to mayor's son in a rigged hole-in-one golf contest constituted a bribe); *see also United States v. DeMizio,* No. 08-CR-336 (JG), 2012 WL 1020045, at *10 (E.D.N.Y. Mar. 26, 2012) ("Many courts have (at least implicitly) recognized that payments to a person's family member may constitute a bribe or kickback." (citations omitted)). As the *DeMizio* court explained, in the context of reviewing a defendant's conviction on a charge of conspiracy to commit securities fraud or wire fraud in violation of 18 U.S.C. §§ 1343, 1346, and 1348-49, "[t]he benefit to a person from payments to a relative may be indirect, but those

payments constitute kickbacks nonetheless." 2012 WL 1020045, at *11. "A kickback consists of something of value 'which is provided, directly or indirectly,' to a recipient for an improper purpose." *Id.* (citing *Skilling v. United States,* 130 S. Ct. 2896, 2934 (2010) (quoting 41 U.S.C. § 52(2)). "[And] if there is a sufficiently close relationship between a third party receiving payments and the person whose influence is sought, that person benefits indirectly." *Id.* at (citing *United States v. McGregor,* No. 2:10cr186-MHT, 2011 WL 1576950, at *4 (M.D. Ala. Apr. 4, 2011)).

Moreover, Advisory Opinions issued by the Office of the Inspector General ("OIG") for the Department of Health and Human Services, and cited by Morris, suggest that payments to family members can constitute "remuneration." For example, in OIG Advisory Opinion No. 08-02, the OIG explains that even "charitable donations" may be "disguised kickbacks." OIG Advisory Op. No. 08-02, Dkt. 247, Ex. M at 5. "[P]otentially problematic contributions include…contributions to private foundations…directed or controlled by referral sources (*or family members*)…[and] to organizations that employ or otherwise compensate referral sources (*or family members*)." *Id.* (emphasis added).[8]

---

[8] The relator also presents evidence that, after Omnicare acquired Total Pharmacy, Dacy and Paler donated $510,000 and $290,000, respectively, to the Chabad of Ormond Beach, a Jewish religious school now called the Esformes Hebrew Academy. Pl. 56.1 Statement of Additional Facts, Dkt. 256 at ¶ 21. Morris testified that he "built" the school, donated 90% of the funds to the project, and solicited contributions from Dacy and Paler. *Id.* The relator contends, and the defendant vigorously disputes, that there is at least a factual dispute as to whether those donations qualify as "remuneration" for purposes of the AKS. This factual scenario presents a more difficult question because the relator has not presented evidence that these donations inured to the benefit of either the referral source, Morris, or his immediate family member, Philip. For instance, there is no evidence that Morris or Philip controlled or were employed by the school. However, because the relator has already presented sufficient evidence to survive summary judgment on this element of her claim, the Court need not decide the issue in the context of this motion.

Further, as touched on above, Morris commissioned the legal opinion opining on Total Pharmacy's compliance with the AKS, made the decision to switch all of his homes to Total Pharmacy, attended and hosted meetings between Omnicare and Total Pharmacy concerning Omnicare's acquisition of Total Pharmacy, assisted in delivering the Missouri Homes to Total Pharmacy, and renegotiated the one-year contracts his nursing homes had with Total Pharmacy to five-year, for-cause contracts in the run up to Total Pharmacy's sale. *See id.* at ¶¶ 4-5, 17, 18, 28, 34, 42. All of these facts permit a reasonable inference that Morris knowingly and willfully accepted remuneration in exchange for referrals. To be sure, Morris may testify that he did not engineer Philip's good fortune, or that it was not a means of remuneration for referrals. Evaluating the competing inferences permitted by the evidence, however, is the province of a jury. Accordingly, Morris's motion for summary judgment is denied.

### 4. *State Law Claims*

Morris and Philip also argue that they are entitled to summary judgment on the relator's state law claims for the same reasons as the FCA claim. *See* Morris's Mot. for Summ. J., Dkt. 246 at 17-18; Philip's Mot. for Summ. J., Dkt. 250 at 20-21. Accordingly, for the same reasons set forth above, the defendants' motions for summary judgment on the relator's state law claims are denied as well.

As a final matter with respect to the summary judgment motions, Philip argues that he is entitled to a complete setoff in the amount of the settlement between the relator and Omnicare, and summary judgment should be granted in his favor in that regard. The relator responds, and the Court agrees, that at this posture of the litigation, the matter is premature. Accordingly, Philip's motion for summary judgment as to a setoff is denied without prejudice.

### C.  Relator Nehls' Motion to Dismiss Philip Esformes' Counterclaim

The Court next addresses the relator's motion to dismiss Philip's counterclaim alleging that Nehls breached her fiduciary duty to Total Pharmacy and its members, to include Philip, by failing to report that Total Pharmacy was set up on an illegal kickback scheme in violation of the AKS. *See* Pl. Mot., Dkt. 234. To state a claim for breach of fiduciary duty under Illinois law, "a plaintiff must allege the existence of a fiduciary duty, the breach of that duty, and damages proximately caused therefrom." *Duffy v. Orlan Brook Condominium Owners' Ass'n,* 981 N.E.2d 1069, 1075 (1st Dist. 2012) (citing *Neade v. Portes,* 193 Ill. 2d 433, 739 N.E.2d 496 (2000)).

Philip contends that Nehls was hired by Total Pharmacy in 2002 to serve as the Vice President of Pharmacy Operations and was, therefore, responsible for overseeing all of Total Pharmacy's operations, customer service, deliveries, and other day-to-day operations. Philip's Answer, Dkt. 232 at 42. In addition to her duties as Vice President, Nehls was also a member of the Compliance Committee and signed a Code of Ethics, which required her to ensure that personnel were acting ethically and in compliance with applicable laws and regulations. *Id.* at 42-43. Further, because Nehls' position and responsibilities qualified her as an officer of the company, she owed Total Pharmacy and its members a fiduciary duty. Philip's Resp., Dkt. 252 at 4. According to Philip, Nehls breached that fiduciary duty when she failed to "advise or otherwise notify her supervisor, any Total Pharmacy owner, officer or director, or anyone else at Total Pharmacy" that the company was set up on an illegal kickback scheme. Philip's Answer, Dkt. 232 at 43. Philip contends that, as an officer, or more appropriately in this case, manager of the LLC, Nehls breached a fiduciary duty to the company and its owners to provide them with the information on which she based her *qui tam* complaint.

Philip, relying on corporate law principles, is correct that "generally, corporate officers…owe a fiduciary duty to the corporation and its shareholders." *Workforce Solutions v. Urban Srvs. of Am., Inc.,* 977 N.E.2d 267, 284 (1st Dist. 2012) (citing *Paul H. Schwendener, Inc. v. Jupiter Electric Co.,* 358 Ill. App. 3d 65, 75, 829 N.E.2d 818 (1st Dist. 2005)). The same may be said of managers of limited liability companies, such as Total Pharmacy. *See Brahos v. Chickerneo,* No. 2-11-0616, 2012 WL 6968469, at *9 (2d Dist. May 4, 2012) ("[Illinois'] Limited Liability Company Act provides that a manager in a manager-managed LLC owes the fiduciary duties of loyalty and care to the company and other members and must discharge his or her duties 'consistent with the obligation of good faith and fair dealing.'") (citing 805 ILCS 180/15-3). Moreover, for purposes of deciding a motion to dismiss, there is at least a reasonable inference that failure to report a compliance issue could constitute a breach of that fiduciary duty. Where Philip's counterclaim runs into problems, however, is the third element of his claim—damages proximately caused by the breach.

Here, Philip contends that Nehls' alleged breach has caused Philip to incur "substantial money damages…including but not limited to the substantial litigation expenses he has incurred in the defense of this lawsuit, and the compensation Total Pharmacy paid to [Nehls] during and after her breach of fiduciary duty." Philip's Answer, Dkt. 232 at 45. This contention falters coming out of the gate, because there is no causal link between Nehls' alleged failure to report violations and Philip's litigation expenses. Nehls did not face an "either or" choice; she could have informed Total Pharmacy of the violations and still have filed this *qui tam* action. In that case, Philip would still have incurred litigation expenses. Accordingly, there is no causal link between the alleged breach of fiduciary duty and the litigation expenses. *United States ex rel. Grandeau v. Cancer Treatment Ctrs. of Am.,* 350 F. Supp. 2d 765, 773 (N.D. Ill. 2004)

("Regardless of the scenario, relator could have brought the *qui tam* action, causing defendant to incur litigation expenses defending against that action. Thus, there is no causal link between the breach of fiduciary duty and the litigation expenses defendant has spent to defend against the *qui tam* action.").

There is another problem with the damages sought by the counterclaim. Any cause of action and damages related to Nehls' salary would belong to Total Pharmacy, rather than any single member of the limited liability company. *See, e.g, Larochelle v. Allamian,* 361 Ill. App. 3d 217, 228, 836 N.E.2d 176, 186-87 (2d Dist. 2005) ("The shareholder standing rule bars claims by corporate shareholders where there is no showing that the plaintiff was injured in any capacity other than in common with fellow stockholders; in such a situation, the cause of action belongs to the corporation." (citation omitted)); *see also Hernandez v. Clearview Constr.,* No. CV085013763, 2011 WL 3587383, at *4 (Conn. Super. Ct. July 19, 2011) ("It is an elementary principle of corporate law that a corporation and its stockholders are separate entities and that…corporate property is vested in the corporation and not in the owner of the corporate stock…That principle also is applicable to limited liability companies and their members." (citations omitted)). And in this case, Philip has expressly stated that he is suing in his own capacity and not on behalf of Total Pharmacy. Philip's Resp., Dkt. 252 at 6. So, to the extent that Philip seeks to recover expenses paid by Total Pharmacy, he has no standing to do so.

In any event, the issue is effectively moot because the Court determines that Philip's counterclaim is foreclosed under the FCA. As the court in *United States ex rel. Miller v. Bill Harbert Int'l Construction, Inc.* has succinctly explained, the rule emerging from the cases that have decided this issue is that "a claim by an FCA defendant which requires for its success a finding that the FCA defendant is liable is…barred by the FCA." 505 F. Supp. 2d 20, 28 (D.D.C.

34

2007). This is so because, as numerous courts have determined, an FCA defendant cannot seek contribution or indemnification from a relator. *See id.* at 26 ("The unavailability of contribution and indemnification for a defendant under the [FCA] now seems beyond peradventure." (citing *United States ex rel. Taylor v. Gabelli,* No. 03 CIV 8762(PAC), 2005 WL 2978921, *13 (S.D.N.Y. Nov. 4, 2005); *United States ex rel. Mikes v. Straus,* 931 F. Supp. 248, 261-62 (S.D.N.Y. 1996); *United States v. Dynamics Research Corp.,* 441 F. Supp. 2d 259 (D. Mass. 2006); *United States ex rel. Scott v. Metro. Health Corp.,* No. 1:02-CV-485, 2005 WL 3434830 (W.D. Mich. Dec. 13, 2005); *United States ex rel. Public Integrity v. Therapeutic Tech., Inc.,* 895 F. Supp. 294, 296 (S.D. Ala. 1995); *United States v. Nardone,* 782 F. Supp. 996, 999 (M.D. Pa. 1990); *United States v. Kennedy,* 431 F. Supp. 877 (C.D. Cal. 1977)); *see also United States ex rel. Vainer v. DaVita, Inc.,* No. 1:07-CV-2509-CAP, 2013 WL 1342431, at *4 (N.D. Ga. Feb. 13, 2013) ("[A] claim for contribution or indemnity for wrongdoing is barred by the [FCA]. (citing *Israel Discount Bank Ltd. v. Entin,* 951 F.2d 311, 315 n. 9 (11th Cir. 1992)).

The reason for the rule is simple to understand; without it, relators would be discouraged from bringing suit, thereby "imperil[ing] the federal interests which the FCA seeks to vindicate. *Id.* at 26 (citing *Mortgages, Inc. v. United States District Court for the District of Nevada,* 934 F.2d 209, 213 (9th Cir. 1990)). Moreover, the FCA includes explicit provisions for reducing the award to a relator with "unclean hands," *see* 31 U.S.C. § 3730(d)(3), as well as a provision allowing for the recovery of attorney fees, but only if the defendant prevails and the court finds that the FCA claim was frivolous. *See* 31 U.S.C. § 3730(d)(4). In other words, claims for contribution and indemnification against relators would not only "frustrate [t]he FCA's purpose of encouraging whistleblowing," *Vainer,* 2013 WL 1342431 at *4 (citing *Miller,* 505 F. Supp. 2d

at 28-29), but also "upset the carefully calibrated framework under which relator compensation is to be figured." *Miller,* 505 F. Supp. 2d at 26.

For the same reasons, "there can be no right to assert state law counterclaims that, if prevailed on, would end in the same result." *Id.* (citing *Mortgages,* 934 F.2d at 214; *see also United States ex rel. Madden v. General Dynamics Corp.,* 4 F.3d 827 (9th Cir. 1993); *Israel Discount Bank,* 951 F.2d 311; *Heart Doctors, P.S.C. v. Layne,* No. 6:05-636, 2006 WL 2692694 (E.D. Ky. Sept. 13, 2006)). Despite his assertions to the contrary, Philip's state law counterclaim for breach of fiduciary duty is just such a claim. At bottom, his counterclaim is predicated on his own liability for an FCA violation, and would therefore shift the costs of that violation to the relator in the event he is found liable—implicating all of the policy considerations explained above.

Put another way, Philip's counterclaim alleging that Nehls failed to report FCA violations is only viable if he proves that he committed an FCA violation. Otherwise, there would have been nothing for Nehls to report, and therefore, no breach of fiduciary duty. As courts dealing with this precise issue have previously held, such a counterclaim is the equivalent of a claim for contribution or indemnification, and therefore foreclosed by the FCA. *See Miller,* 505 F. Supp. 2d at 25-29 (holding that FCA defendant's counterclaim that the relator failed to report the alleged fraud to the defendant company sooner was barred under the FCA); *United States ex rel. Newsham v. Lockheed Missiles & Space Co., Inc.,* 779 F. Supp. 1252 (N.D. Cal. 1991) (holding that FCA defendant's counterclaims alleging, *inter alia,* that relators breached their fiduciary duty by failing to report their concerns to management was barred under the FCA).

The defendant contends that other courts have permitted counterclaims against relators for breaches of fiduciary duty, noting, as this Court explained above, that the key factor was

whether the counterclaim was dependent on the defendant's liability. *See* Philip's Resp., Dkt. 252 at 6-7. The cases he cites, however, only serve to undermine his argument. For instance, in *Grandeau,* an FCA defendant was allowed to pursue a counterclaim for breach of fiduciary duty against a relator. But in that case, the basis for the claim was that the relator had failed to notify her superiors of a government subpoena, kept the subpoena secret, and failed to disclose the documents she produced to the government pursuant to the subpoena. 350 F. Supp. 2d at 771. Therefore, as the *Grandeau* court explained, the basis of the counterclaim was "independent of relator's *qui tam* action." *Id.* at 770. In other words, the *Grandeau* defendant could have pursued that claim regardless of whether the relator had filed a *qui tam* suit. And unlike Philip's counterclaim, the counterclaim in *Grandeau* was not contingent on a finding that the defendant was liable for the FCA at issue.

Where there is a clear distinction between the facts supporting the counterclaim and the facts supporting the defendant's FCA liability, the counterclaim is independent of the FCA claims and may proceed. *See, e.g., Miller,* 505 F. Supp. 2d at 27 (citing *Grandeau,* 250 F. Supp. 2d 765; *Scott,* 2005 WL 3434830 (relator committed serious litigation abuses); *United States ex rel. Hartman v. Allegheny Gen. Hosp.,* No. Civ. A. 02-1948, 2005 WL 2106627 (W.D. Pa. Aug. 26, 2005) (relator deleted billing records unrelated to the FCA claim)). But, as explained above, that is not the case here. Accordingly, the defendant has failed to state a counterclaim upon which relief can be granted as a matter of law. The relator's motion to dismiss is therefore granted.

*     *     *

For the reasons set forth above, the defendants' motions to strike and for summary judgment are denied. The relator's motion to dismiss Philip's counterclaim is granted. Philip's

motion for summary judgment as a setoff in the amount of the Omnicare settlement is denied without prejudice.

Entered: July 23, 2013

_____
John J. Tharp, Jr.
United States District Judge